J. Will Varin
ISB #6981; willvarin@varinwardwell.com
VARIN WARDWELL THOMAS & KUNKEL, PLLC
P.O. BOX 1676
Boise, Idaho 83701
Telephone: (208) 922-7060
Facsimile: (866) 717-1758

Debra A. Clifford
ISB #9029; dclifford@gibbonslaw.com
GIBBONS P.C.
One Gateway Center
Newark, NJ 07102
Telephone:  (973) 596-4843
Facsimile:  (973) 639-6498

*Counsel to James R. Zazzali, Trustee for the DBSI Private Actions Trust*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| JAMES R. ZAZZALI, as Trustee for the DBSI Private Actions Trust,<br><br>            Plaintiff,<br><br>    v.<br><br>CROWN CAPITAL SECURITIES, LLC; GENEOS WEALTH MGMNT; WAVELAND CAPITAL PARTNERS, LLC; WILSON DAVIS; WOODBURY FINANCIAL SERVICES, INC.; AIG ADVISOR GROUP, INC.; DELTA CAPITAL HOLDINGS, LLC; GWM HOLDINGS, INC.; HARTFORD LIFE & ANNUITY INSURANCE CO.; WAVELAND CAPITAL GROUP LLC; BRIAN MURPHY; BYRON BARKLEY; DAROL KENNETH PAULSEN; DEAN ALLEN RAGER; DON MICHAEL EDWARDS; GEORGE THEODORE DIACHOK; JAMES C. SNOW, JR.; JODEE MAY BRUBAKER-RAGER; JONATHAN LEE FRENCH; LYLE WESLEY DAVIS; MICHAEL JEROME GREER; NILS HENRIK SUNDSTEDT; PAUL NOFEAR | Civil Action No: 14-cv-00422<br><br><br><br><br><br><br>**DEMAND FOR JURY TRIAL** |

DAVIS; PHYLLIS JEAN PAULSEN;
RICHARD DAVID FERGESEN; RUSSELL
RHINE DIACHOK; STEVEN RONALD
SUNSTEIN; VICKIE JO GREER; WALTER
WHITE; WILLIAM LESTER WALKER; and
JOHN DOE 1-500,

                    Defendants.

## FIRST AMENDED COMPLAINT

1.      Plaintiff, James R. Zazzali, Trustee for the DBSI Private Actions Trust ("PAT"),

makes the allegations set forth herein based upon the investigation made by and through his

counsel, including a review of relevant publicly available documents, court filings, including

those filed by the court-appointed Examiner, Joshua R. Hochberg, offering documents, including

those prepared by Diversified Business Services & Investments, Inc. ("DBSI") and/or its

affiliates and disseminated by the Broker-Dealer Defendants, and news articles and reports

concerning the DBSI Companies.  This Complaint is based upon Plaintiff's personal knowledge

as to his own acts, and upon information and belief as to all other matters, based upon the

aforementioned investigation.

## NATURE OF THE ACTION

2.      This is an action brought under the Securities Exchange Act of 1934 on behalf of

members of the PAT who purchased or otherwise acquired securities in one or more DBSI

created investment offerings from one or more of the Broker-Dealer Defendants, as defined more

fully below in the subsection labeled "The Parties," in what turned out to be nothing more than a

classic Ponzi[1] scheme that collapsed in November 2008 when ninety-three (93) DBSI Companies

filed petitions for bankruptcy.

---

[1]      A Ponzi scheme is defined as "A fraudulent investment scheme in which money
contributed by later investors generates artificially high dividends for the original investors,
whose example attracts larger investments.  Money from the new investors is used directly to

3.      The DBSI securities sold by the Broker-Dealer Defendants were offered to Investors through public solicitations.

4.      The offering materials pursuant to which the Broker-Dealer Defendants offered and sold the DBSI securities, including the private placement memoranda, Subscription Agreements and/or Letters of Intent and/or Purchaser Questionnaires and Soliciting Dealer Agreements, were materially false and misleading because they misrepresented and omitted material facts pertaining to the due diligence the Broker-Dealer Defendants were obligated to conduct, the terms of the offerings and the use of the funds, including that certain investments were kept afloat via improper inter-fund transfers, and other material facts pertaining to the terms of the securities and the risks of investment in the DBSI securities.

5.      Plaintiff brings this action under Section 10(b) of the Securities Exchange Act and relevant state statutes against the Broker-Dealer Defendants and their affiliates for their role in the offer and sale of the DBSI securities in violation of federal securities laws and pursuant to materially false and misleading offering materials.

6.      Through this Complaint, Plaintiff seeks to recover the losses resulting from the fraudulent marketing and sale of DBSI securities by the Broker-Dealer Defendants.

7.      The relevant background regarding the factual bases for this litigation is set forth in the "Factual Background" section of this Complaint.

---

repay or pay interest to earlier investors, usually without any operation or revenue-producing activity other than the continual raising of funds.  This scheme takes its name from Charles Ponzi, who in the late 1920s was convicted for fraudulent schemes he conducted in Boston." Black's law Dictionary at 1198 (8th ed. 2004).

8.     For purposes of this Complaint, the following terms shall have the meaning ascribed to them below:[2]

a.  "2005 Secured Notes Corp." shall mean the DBSI 2005 Secured Notes Corporation.

b.  "2006 Secured Notes Corp." shall mean the DBSI 2006 Secured Notes Corporation.

c.  "2008 Notes Corp." shall mean the DBSI 2008 Notes Corporation.

d.  "DBSI" shall mean Diversified Business Services & Investments, Inc., which was formerly known as DBSI Housing Inc.

e.  "DBSI Companies" shall mean the Consolidated Debtor and Non-Debtor Entities identified in the Plan, including exhibits thereto.

f.  "Broker-Dealer Defendants" shall mean the corporate broker-dealer entities named as defendants in this Complaint.

g.  "Control Person Defendants" shall mean the individuals and entities named as defendants in this Complaint and listed on Exhibit A attached hereto.

h.  "Examiner" shall mean court-appointed bankruptcy examiner Joshua R. Hochberg.

i.  "Funding Entities" shall refer to collectively, the Notes Corps., Bond Corps., and Development Funds.

j.  "GAAP" shall mean Generally Accepted Accounting Principles.

k.  "Insiders" or "DBSI Insiders" shall mean David Swenson, Douglas Swenson, Jeremy Swenson, Charles Hassard, John Mayeron, Thomas Var Reeve, Gary

---

[2]     Capitalized terms not otherwise defined herein shall have the meaning ascribed to such terms in the Plan.

Bringhurst, and Mark Ellison, who owned, controlled, operated and managed the DBSI Companies.

l.    "Investor" shall mean anyone who invested funds in any of the securities or real estate products issued by DBSI.

m.    "LTV" shall mean loan-to-value ratio.

n.    "Master Leaseco" shall mean DBSI Master Leaseco Inc.

o.    "PAT" shall mean the DBSI Private Actions Trust.

p.    "Petition Date" shall mean November 10, 2008.

q.    "Plan" shall mean the Second Amended Joint Chapter 11 Plan of Liquidation for DBSI confirmed by Order of the United States Bankruptcy Court for the District of Delaware dated October 26, 2010.

r.    "PPM" shall mean private placement memorandum.

s.    "SPE" shall mean special purpose entity.

t.    "Stellar" shall mean Stellar Technologies LLC.

u.    "TIC" shall mean tenant-in-common.

v.    "TIC Investor" shall mean anyone who purchased a TIC interest from the DBSI Companies.

w.    "Trustee" shall mean Plaintiff James R. Zazzali, the Court-approved trustee for the PAT.

## **PROCEDURAL HISTORY**

9.    On or about November 10, 2008, numerous DBSI Companies filed voluntary petitions for relief under the Bankruptcy Code.

10.    On April 14, 2009, the Bankruptcy Court entered an Order approving the appointment of Joshua R. Hochberg as Examiner.  The Examiner issued an Interim Report of his investigative findings on August 3, 2009.  Based, in part, on the Examiner's preliminary findings, on September 11, 2009, the Bankruptcy Court approved the appointment of former Chief Justice of the New Jersey Supreme Court, James R. Zazzali, as Chapter 11 Trustee for the DBSI Companies.

11.    The Examiner issued his Final Report on October 19, 2009.  He  reached numerous conclusions regarding financial improprieties engaged in by the DBSI Companies, including improprieties in connection with the marketing and sale of DBSI securities by the Broker-Dealer Defendants, as follows:  (1) The DBSI Group businesses were in continuous need of new Investor funds to fund pre-existing obligations at least as early as 2005.  DBSI engaged in excessive unwarranted insider distributions; (2) DBSI management directed that Investor funds be used to meet pre-existing obligations and operating expenses by evading restrictions governing the use of the funds; (3) loans were made from Investor funds that were not backed by adequate security, debt was reallocated through after-the fact bookkeeping entries in an effort to make it appear that loans were adequately secured, and inflated values were arbitrarily assigned to the assets "securing" loans; (4) DBSI booked profits from inflated markups of real estate for sale to outside Investors.  Most of these profits were consumed by the costs of such sales.  The inflated sales prices included arrangements obligating DBSI to make guaranteed payments to Investors.  But the operations of the underlying properties could not support these guaranteed Investor payments; (5) the marketing claim contained in DBSI PPMs that "no investors had ever lost money" was illusory and masked the fact that newly raised Investor funds were being used

to pay off existing Investors; (6) tenant-in-common Investor,[3] and bond and note money were used interchangeably and pooled to make required payments when they came due.  Investor funds from all sources were commingled and treated as fungible.  The same funds were transferred and retransferred between numerous entities, often on a daily basis; (7) most of the financial statements for DBSI Companies were not independently audited or certified; (8) "Accountable Reserves," which were marketed by the Broker-Dealer Defendants as restricted to property improvements, were used as a source of cash for DBSI's cash strapped operating companies; (9) the DBSI Companies were managed and operated without regard for the separate identities of the companies within the DBSI Group.  Transactions among companies in the DBSI Group were rarely documented properly; (10) Investor funds were routinely used for purposes not intended by the Investors in order to perpetuate the DBSI Ponzi scheme, pay unearned distributions to Insiders, and fund investments in other companies.[4]

12.    On October 26, 2010, the Bankruptcy Court issued Findings of Fact, Conclusions of Law and Order Confirming Second Amended Joint Chapter 11 Plan of Liquidation in the bankruptcy proceedings.  In so doing, the Bankruptcy Court made the following factual findings:

- [T]he funds of the DBSI enterprise are commingled and inter-entity claims and obligations are a hopeless tangle.  The ledgers maintained by the various DBSI entities reflect transactions of staggering complexity. . . . Assets and liabilities were moved between the DBSI enterprise without regard for arms-length exchanges of value.  Entities loaned money based upon collateral of dubious value.  Funds were commingled and paid out without regard to source.  Important transactions were insufficiently documented.

- Accountable Reserves, proceeds from the sale of notes and bonds to the Note/Bond/Fund Investors and other revenues were pooled and disbursed based upon the needs of the Debtors at the moment . . .

---

[3]    The concept of tenant-in-common investor interests in property is explained more fully in subsection C of the "Factual Background" section of this Complaint.

[4]    See Final Report at pp. 7-10.

- [DBSI Insiders] operated the entities as a single economic enterprise. All of the entities were housed in the central DBSI offices, and their boards, officers and/or general partners were mostly the same Insiders.

- With respect to TIC Investors, DBSI guaranteed the TIC rent payments to TIC Investors and made such payments even where the TIC property generated no cash flow. Prior to the Petition Date, TIC rent payments were being paid to TIC Investors, with a total book expense of $8,663,050 per month (as of January 2008) and an actual monthly cash outlay of $7,945,000, which also were being fed by the stream of funds coming from new TIC Investors through their Accountable Reserves.

13.    Four trusts were created pursuant to the Plan. For two of these trusts -- the DBSI Estate Litigation Trust and the PAT -- James R. Zazzali, Esq. is the Trustee.

14.    On April 14, 2014, Insiders Douglas Swenson, Mark Ellison, David Swenson and Jeremy Swenson were convicted of 44 counts of federal securities fraud. Douglas Swenson was also convicted of 34 counts of wire fraud. United States v. Swenson , et al., 13-cr-00091 (D. Idaho).

**THE PARTIES**

**PLAINTIFF**

15.    Plaintiff James R. Zazzali is the Court-approved trustee for the PAT. The PAT was created by the Plan to hold all Non-Estate Causes of Action[5] assigned to that trust by

---

[5]    The Plan defines *"Non-Estate Causes of Action"* as those Causes of Action which are held by a TIC Investor, or a Holder of a Note Claim, a Bond Claim, a Preferred Unit, a Sharing Unit or a Non-Preferred Unit, arising from any matter involving the Plan Debtors and Consolidated Non-Debtors against: (i) all current and former officers, directors, members, shareholders or employees of any of the Plan Debtors; (ii) all Persons or Entities that conducted transactions with any of the Plan Debtors, including, without limitation, investment bankers and lenders; and (iii) all Persons or Entities that provided professional services to any of the Plan Debtors, including, without limitation, all attorneys, accountants, auditors, financial advisors and other parties providing services to the Plan Debtors in connection with the public issuance of debt or equity, including, without limitation, all underwriters, due diligence providers, or securities brokers/dealers; provided, however, Non-Estate Causes of Action shall exclude (a) contract claims against third parties, (b) claims for violations of securities laws that are currently being asserted in the class action styled Myles W. and Jannelle S. Spann Trust v. DBSI Inc., et al., Case No CV OC 0820435, Fourth Judicial District Court, Ada County, Idaho (the "Spann

creditors and equity holders of DBSI, including claims against the Broker-Dealer Defendants. The Trustee brings the claims asserted herein in his own name as the duly authorized representative of the assigning Investors who purchased DBSI securities from the Broker-Dealer Defendants.

**DEFENDANTS**

16.     Defendant Crown Capital Securities, LLC is a registered broker-dealer, and was at all relevant times, a Delaware corporation with its principal place of business in Orange, California.  Upon information and belief, Crown Capital Securities, LLC was at all relevant times registered to sell securities and did sell securities in the State of Delaware.

17.     At minimum, Crown Capital Securities, LLC participated in the marketing and sale of the following DBSI Securities to members of the Private Actions Trust: (1) Peachtree Corners Pavilion; (2) Florissant Market Place; and (3) North Jarrell I-35 Units.

18.     Defendant Geneos Wealth Management, Inc. is a registered broker-dealer, and was at all relevant times, a Colorado corporation with its principal place of business in Centennial, Colorado.  Upon information and belief, Geneos Wealth Management, Inc. was at all relevant times registered to sell securities and did sell securities in the State of Delaware.

19.     At minimum, Geneos Wealth Management, Inc. participated in the marketing and sale of the following DBSI Securities to members of the Private Actions Trust: (1) Peachtree Corners Pavilion; (2) Florissant Market Place; and (3) North Jarrell I-35.

20.     Defendant Waveland Capital Partners, LLC is a registered broker-dealer, and was at all relevant times, a Delaware corporation with its principal place of business in Irvine,

---

Action"); and (c) other claims currently being asserted in class actions relating to the Plan Debtors, if any ("Other Class Actions").  A non-exclusive list of potential defendants in the Non-Estate Causes of Action is attached to the Disclosure Statement as Schedule 11.

California.  Upon information and belief, Waveland Capital Partners, LLC was at all relevant times registered to sell securities and did sell securities in the State of Delaware.

21.    At minimum, upon information and belief, Waveland Capital Partners, LLC participated in the marketing and sale of the following DBSI Securities to members of the Private Actions Trust: (1) North Jarrell I-35 TIC; (2) Peachtree Corners Pavilion; and (3) Florissant Market Place.

22.    Defendant Wilson Davis is a registered broker-dealer, and was at all relevant times, a Utah corporation with its principal place of business in Salt Lake City, Utah.

23.    At minimum, Wilson Davis participated in the marketing and sale of the following DBSI Securities to members of the Private Actions Trust: (1) Peachtree Corners Pavilion; (2) Florissant Market Place; and (3) 2008 Development Opportunity Fund.

24.    Defendant Woodbury Financial Securities, Inc. is a registered broker-dealer, and was at all relevant times, a Minnesota corporation with its principal place of business in Oakdale, Minnesota.  Upon information and belief, Woodbury Financial Securities, Inc. was at all relevant times registered to sell securities and did sell securities in the State of Delaware.

25.    At minimum, Woodbury Financial Securities, Inc. participated in the marketing and sale of the following DBSI Securities to members of the Private Actions Trust: (1) Pinehurst Square East; (2) Peachtree Corners Pavilion; and Belton Town Center.

26.    The Control Person Defendants are individuals and entities who directly or indirectly controlled the Broker-Dealer Defendants and/or served as managing partners, executive officers, or directors of the Broker-Dealer Defendants.  The corporate Control Person Defendants have the places of incorporation and principle places of business listed on the

attached Exhibit A,[6] and the individual Control Person Defendants have the domiciles listed on the attached Exhibit A.

27.    The Control Person Defendants had the power to direct the management and policies of their respective Broker-Dealer Defendants by virtue of their ownership interests in the Broker-Dealer Defendants and/or their roles as managing partners, executive officers, or directors of the Broker-Dealer Defendants, as described on Exhibit A.

28.    Those Control Person Defendants who did not directly or indirectly control the Broker-Dealer Defendants nonetheless served as managing partners, executive officers, or directors of the Broker-Dealer Defendants, as described on Exhibit A.

29.    Defendants John Doe 1-500 are fictitious names representing one or more persons, corporations or other entities that have been involved as securities broker(s), or in consultation with or otherwise affiliated with other securities broker(s), in the distribution of DBSI Securities to members of the PAT whose true names and capacities are unknown to Plaintiff at this time.  When ascertained, Plaintiff will amend this complaint by inserting the true names and capacities herein.

30.    The defendants, all of which are securities brokers, are sometimes collectively referred to herein as "Defendants."

## JURISDICTION AND VENUE

31.    This Court has jurisdiction by virtue of 28 U.S.C. § 1331, and § 27 of the Securities Exchange Act of 1934, (15 U.S.C. § 78aa), which confer exclusive federal jurisdiction over Plaintiff's federal securities claims.  This Court also has supplemental jurisdiction over

---

[6] Upon information and belief, AIG Advisor Group, Inc., identified on Exhibit A as the majority shareholder of Woodbury Financial Services, Inc., purchased Woodbury Financial Services, Inc. from Hartford Life & Annuity Insurance Co., identified on Exhibit A as the Parent Corporation of Woodbury Financial Services, Inc., on or about December 3, 2012.

Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a) by virtue of the fact that these claims form part of the same case or controversy under Article III of the United States Constitution as Plaintiff's federal securities claims.

32.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because one or more of the Defendants conducted business in this judicial district.  In addition, many of the acts and practices complained of herein have occurred in this judicial district and the Defendants have received substantial compensation by doing business in this judicial district as described more fully below.

33.    At least fifty-nine (59) of the DBSI Companies not incorporated in the State of Delaware have filed for bankruptcy protection in the State of Delaware since November of 2008. A list of those Debtor Entities is attached hereto as Exhibit B.

34.    The Defendants have substantial contacts with Delaware and have purposefully availed themselves of the rights, privileges, and protections of Delaware law.

35.    At least two-hundred-ninety-one (291) DBSI-created entities whose securities were sold to members of the PAT were formed in the State of Delaware.  Ninety three (93) of those DBSI Companies have filed for bankruptcy in Delaware.  Attached hereto as Exhibit C, and incorporated by reference herein, is a chart listing DBSI-created investment entities formed in Delaware and identifying those that have filed for bankruptcy in Delaware.

36.    In addition, DBSI required approximately 90% of their TIC Investors to make their investments in TIC offerings through newly-formed special purpose entities. Approximately 98% of these SPEs were formed in Delaware.  Thus, the sales of TIC offerings were made, near universally, in the first instance to or through Delaware SPEs.

37.    Over 2,500 Delaware SPEs were formed for Investors to invest in DBSI TIC offerings.

38.    Such a high percentage of SPEs were formed in Delaware because the majority of the banks that DBSI worked with required that TIC Investors make their investments through Delaware LLCs.  Thus, the structure of the scheme to defraud -- a scheme in which the Defendants actively participated -- necessarily required that the Defendants avail themselves of the rights, privileges, and protections of Delaware law in order to market and sell the vast majority of the TICs and perpetuate the fraudulent scheme described herein.

39.    For example, in conjunction with Paul Kenworthy's investment in DBSI Landmark Towers LLC, a Delaware SPE was registered on Mr. Kenworthy's behalf, R & R-Landmark Towers LLC, which acted as the financial vehicle for Mr. Kenworthy's TIC investment.

40.    For an additional example, in conjunction with Michael Cox's investment in DBSI Shoppes at Trammel LLC, a Delaware SPE was registered on Mr. Cox's behalf, Cox-Shoppes at Trammel LLC, which acted as the financial vehicle for Mr. Cox's TIC investment.

41.    The foregoing are only representative examples of how the scheme to defraud Investors was perpetrated within the State of Delaware.  Indeed, no fewer than 2,500 Delaware-based SPEs -- substantially similar to the examples referenced above -- served as financial vehicles in the scheme to defraud TIC Investors.

42.    In connection with the acts alleged in this Complaint, the Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, use of the mails and interstate telephone communications.

## FACTUAL BACKGROUND

### A.    Introduction

43.    Throughout its history, the DBSI Companies  -- with the aid and assistance of the Broker-Dealer Defendants -- sold Investor interests that guaranteed certain returns to Investors. The offering materials used by the Broker-Dealer Defendants to solicit investments in the DBSI securities proclaimed that DBSI had a long history during which no Investor had ever lost money, and that investments in DBSI securities had provided significant annual returns even during poor real estate markets.

44.    This false depiction of financial stability was maintained by generating a consistent influx of cash from new Investors with the aid and assistance of the Broker-Dealer Defendants through a continuing series of serial bond, note and fund offerings and sales of TIC Investor interests in property that frequently exceeded the fair market value of that property.

45.    The DBSI Companies and the Broker-Dealer Defendants relied on a steady and increasing flow of new Investor money in order to fund the DBSI Companies' business operations, repay prior Investors and keep DBSI's Ponzi scheme afloat.

46.    In all, the DBSI Companies, with the aid and assistance of the Broker-Dealer Defendants, raised over $500 million dollars from Investors through offerings in bonds, notes, funds and TIC investment programs.

### B.    The Broker-Dealer Defendants Were Sellers Of The DBSI Securities

47.    Beginning at least as early as 1999, the DBSI Companies began to offer and sell DBSI securities through a nationwide network of securities brokers including the Broker-Dealer Defendants named herein.

48.    The offerings typically provided a sales commission to securities brokers in the amount of 7% of the offering proceeds, plus a 0.5% due diligence fee and a 0.5% marketing fee resulting in a total fee to the securities broker of 8% of offering proceeds.

49.    Each Broker-Dealer Defendant executed a Dealer Agreement for each DBSI security it sold.  Pursuant to DBSI's standard "Soliciting Dealer Agreement," each Broker-Dealer Defendant agreed that it would "make no representation with respect to the offering and/or sale of the interests not contained in the [PPM]."  The Dealer Agreements further required the Broker-Dealer Defendants to agree that in connection with the offer and sale of the DBSI securities they would "use only the [PPM] then currently effective, and make no offer of the Interests unless such offer is preceded or accompanied by the [PPM]."  The Dealer Agreements also required each Broker-Dealer Defendant to deliver a copy of the PPM to any potential Investor before the Investor submitted a written offer to invest.  The ultimate responsibility of communicating each PPM's representations to the Investor lay with the Broker-Dealer Defendants.

50.    Pursuant to the Dealer Agreements, the Broker-Dealer Defendants were permitted free access to DBSI and the offering entity for additional information at the securities broker's sole discretion:  "The Company will counsel with the Dealer and its salesmen upon request and/or the clients of the Dealer, and will assist the Dealer in familiarizing its sales force with the Company and the Interests."

51.    A representative sample of a Dealer Agreement, in a form substantially identical to those executed by the Broker-Dealer Defendants in connection with the sale of DBSI securities is attached as Exhibit D to this Complaint.

52.     In connection with the sale of DBSI securities to them by the Broker-Dealer Defendants, all Investors -- including those who have assigned their claims to Plaintiff -- were required to sign a Purchase Agreement and/or Subscription Agreement stating that they relied on the information and representations contained in the PPMs and did not rely on any information inconsistent with the disclosures set forth in the PPMs in deciding whether to invest in DBSI securities.  Representative samples of a Purchase Agreement and Subscription Agreement, in forms substantially identical to those executed by members of the PAT in connection with the purchase of DBSI securities, are attached as Exhibit E to this Complaint.  Each Broker-Dealer Defendant named in this Complaint offered and sold at least one DBSI offering.  Each Broker-Dealer Defendant signed a Dealer Agreement for each separate offering, agreeing to offer and sell the DBSI securities by making only the statements contained in the PPMs and brochures with similar information that were provided by the DBSI Companies.

53.     Implicit with being a licensed securities broker is an acknowledgment of the broker's obligation to comply with all state and federal securities laws and FINRA rules. Moreover, in every instance where a Subscription Agreement was executed in connection with the sale of a DBSI security, the relevant Broker-Dealer Defendant acknowledged its obligations to comply with all "state and federal securities laws and NASD Rule 2810."  In addition, with almost no exception, in the Subscription Agreement and/or Letter of Intent and/or Purchaser Questionnaire for each DBSI security, each Broker-Dealer Defendant certified that it had "reasonable grounds to believe, on the basis of information supplied by the Purchaser, and other pertinent information," that the DBSI security was a "suitable investment for the Purchaser." Each Broker-Dealer Defendant thereby represented that it had undertaken a due diligence investigation sufficient to cause it to reasonably believe the investment was suitable for the

Investor.  True and correct copies of a Letter of Intent and Purchaser Questionnaire, in forms substantially identical to those executed by members of the PAT in connection with the purchase of DBSI securities, are attached as Exhibit F to this Complaint.

54.    The Broker-Dealer Defendants were offerors and sellers within the meaning of the federal securities laws because they actively solicited the sale of and sold DBSI securities.

55.    As described above, the Broker-Dealer Defendants received fees, including commissions and due diligence fees for their sales of DBSI securities to Investors.  In selling the DBSI securities, the Broker-Dealer Defendants were motivated at least in part by a desire to serve their own financial interests.

56.    The Broker-Dealer Defendants recommended each investment in the DBSI securities to Investors who purchased DBSI securities from them.

57.    Each Broker-Dealer Defendant acted in a fiduciary capacity to Investors who purchased DBSI securities from them.

58.    Each Broker-Dealer Defendant collected substantial sales commissions in connection with the sale of DBSI securities to Investors.

59.    Each Broker-Dealer Defendant collected substantial marketing fees in connection with the sale of DBSI securities to Investors.

60.    Each Broker-Dealer Defendant collected substantial due diligence fees in connection with the sale of DBSI securities to Investors for each offering but failed to conduct adequate due diligence as it was obligated to do.

**C.    The Broker-Dealer Defendants Marketed and Sold Various DBSI Securities.**

61.    The DBSI Companies marketed and sold securities via TIC offerings and through the Funding Entities.

17

### (1)    TIC Offerings

62.    Section 1031 of the Internal Revenue Code permitted owners of real estate to shelter gains they might have in their property when it was sold, if the proceeds were used to purchase a similar or "like-kind" property within a certain time period.  In 2002, the IRS ruled that such like-kind property may be a TIC interest in new property, provided that the TIC interest was of equivalent value.  This ruling permitted section 1031 exchange syndicators -- such as the DBSI Companies -- to sell numerous TIC interests in large real estate properties to Investors who had gains in smaller properties.

63.    The syndication, marketability and sale to Investors of TIC interests in commercial real estate rested on (i) the TIC interests' qualification under Internal Revenue Code Section 1031 as a tax minimization device for sheltering capital gains in commercial real estate, and (ii) on rent proceeds from the properties themselves, that were backed by a guarantee from DBSI.

64.    Following the I.R.S. ruling in 2002, the Insiders became major syndicators of 1031 exchange properties.

65.    The Insiders sold TIC interests in two different ways.  They sold some TIC interests as securities and others in the form of deeded interests in real estate.

### a.    The Real Estate Channel

66.    The DBSI Companies sold TIC interests in the form of deeded interests in real estate.  These sales were conducted through FOR 1031, an Idaho limited liability company formed in August 2003 that was controlled and managed by certain Insiders and later, DBSI.

67.    The TIC Interests were sold to Investors subject to a "master lease" structure, an arrangement similar to a "lease-back."  Under this structure, FOR 1031 (or one of its wholly-

owned, special-purpose entities), acquired real property improved by commercial or residential buildings and sold TIC interests in the property to Investors. The Investors, then as landlords, leased the TIC property back to a DBSI Company "master lessee." The master lessee was responsible for, among other things, managing the TIC property for the TIC owners, making capital improvements, paying debt service (on loans FOR 1031 used to purchase the TIC property), sub-leasing the TIC property to third party sub-tenants, collecting rent from those sub-tenants, and making rent payments to the Investors. The master lessee for the TIC properties sold down the real estate channel was either DBSI or a thinly capitalized Delaware limited liability company formed to serve as master lessee, the obligations of which were guaranteed by DBSI.

68.    To make these TIC interests more appealing, Investors were guaranteed steady returns on their investments in the form of rent payments. The Investors were guaranteed a steady stream of rent payments regardless of the actual cash flow results of the particular property in which they had an ownership interest. FOR 1031 technically would have been responsible for those rent payments, but the Insiders pushed that responsibility to the master lessee. Thus, when DBSI served as master lessee, it was obligated to pay Investors this rent stream. In all other instances, DBSI guaranteed that obligation. Thus, for all of the Insiders' TIC properties sold down the real estate channel, DBSI was ultimately responsible for the stream of rent payments guaranteed to Investors. In addition, DBSI guaranteed acquisition loans FOR 1031 received from lenders.

69.    In essence, the master lease structure allowed FOR 1031 to shift to DBSI all financial risks and liabilities it otherwise would have had in connection with the Insiders' TIC properties syndicated as interests in real estate. This enabled the Insiders to prepare pristine

financial statements for FOR 1031 designed to mislead lenders and Investors into believing that FOR 1031 was financially strong. In reality, because the master lease structure effectively transferred FOR 1031's liabilities "off balance sheet" to DBSI without adequate consideration, the financial figures used by the Insiders to demonstrate FOR 1031's financial health were both fiction and illusion. FOR 1031 was hopelessly insolvent by the end of 2004.

### b.    The Securities Channel

70.    The DBSI Companies also marketed and sold TIC investments as securities through private placements pursuant to Regulation D of the Securities Act of 1933, which exempts certain securities offerings from the registration requirements of the Securities Act.

71.    The terms of TIC offerings were set forth in PPMs disseminated to all Investors by the Broker-Dealer Defendants by and through the mail and/or wires, and affected interstate commerce.

72.    Like the TIC deals sold down the real estate channel, the TIC interests sold as securities were sold subject to a master lease structure. As in the case of the TIC interests sold as real estate, Investors who purchased the TIC interests sold as securities were guaranteed a steady stream of rental income payable to them irrespective of the actual cash flow performance of the property in which they purchased an ownership interest.

73.    DBSI Master Leaseco, Inc. was formed in 2005 to serve as master lessee for the master leases applicable to the TIC properties sold down the securities channel. Master Leaseco was formed and capitalized for the specific purpose of demonstrating to lenders and Investors that there was a financially sound master lessee for each such TIC property. Before Master Leaseco was formed, DBSI or a DBSI subsidiary served as the master lessee for those TIC properties.

74.    As with the TIC properties sold down the real estate channel, the master lessee for TIC properties sold down the securities channel was responsible for managing the TIC property for the TIC owners, making capital improvements, paying debt service, sub-leasing the TIC property to third party sub-tenants, collecting rent from those sub-tenants, and making rent payments to the Investors.  When Master Leaseco served as master lessee, DBSI guaranteed its obligations.

75.    As a result, as with the TIC properties sold down the real estate channel, DBSI was either primarily responsible for the steady stream of rent payments guaranteed to Investors, irrespective of the cash flow performance of the underlying property, or else secondarily liable as the guarantor of Master Leaseco's obligation to make those payments.

### c.    DBSI's Crushing Liability Under the TIC Property Master Leases

76.    In short, DBSI as master lessee or as the guarantor of the master lessee's obligations under the master leases, bore, in full, whatever losses the TIC properties might suffer whether interests in those TIC properties were sold as real estate or as securities.

77.    DBSI's guarantee liability was crushing because it was ever-increasing, recurring, and long-term and because the large majority of real estate assets purchased for TIC syndication were substandard, incapable of producing reliable revenue, financially insecure and generally "toxic."

78.    The DBSI Companies' TIC business did not generate a profit.  As the TIC syndication business failed, the DBSI Companies with the aid and assistance of the Broker-Dealer Defendants attempted to prop it up with cash raised from new TIC syndications.  This practice led to an increasingly desperate search for new properties for which the DBSI Companies paid sums well in excess of what a prudent Investor would have paid.  The increased

volume of TIC syndication projects led to additional overhead and financing costs, which, in turn, led to a continuous scramble to find new properties to purchase, syndicate and pawn off upon unwitting Investors.

79.     The unprofitability of the DBSI Companies' TIC syndication business caused chronic cash shortfalls that had to be funded by additional TIC syndications.  This led to an ongoing scramble to find new properties to purchase and syndicate, which in turn required financing.  Not surprisingly, conventional financing was not available to fund the TIC syndication business on terms favorable to the DBSI Companies.

### (2)     Funding Entities

80.     Because of the unprofitable TIC portfolio and the resulting cash shortfalls, the DBSI Companies utilized the Funding Entities to raise money from Investors.  As described above, the Funding Entities consisted of Notes Corps., Bond Corps. and Development Funds.

81.     Approximately $500 million was raised through the Funding Entities.

82.     The stated purpose of raising funds through the Funding Entities was to loan the proceeds to other DBSI Companies.  In some instances, the proceeds were to be used to purchase properties for TIC syndication.  In other cases, the funds were to be used to re-finance existing obligations.  In still other instances, no purpose beyond lending the funds to other DBSI Companies was specified.

83.     The frequency and size of the DBSI Companies' fundraising efforts -- all of which increased dramatically beginning in 2004 -- and the uses of the resulting cash illustrate that the DBSI Companies relied on a steady, increasing flow of new Investor money in order to fund its operations and to repay prior Investors with new Investors' money.

84.    Investors purchased interests in the Funding Entities through specifically formed limited liability companies.

85.    The Broker-Dealer Defendants marketed and sold securities issued by the DBSI Funding Entities through private placements pursuant to Regulation D of the Securities Act, which exempts certain securities offerings from the registration requirements of the Securities Act.  The terms of these offerings were set forth in confidential PPMs.

86.    The Broker-Dealer Defendants caused these PPMs, as well as offering circulars and other offering materials used to market the Funding Entities, to be disseminated to Investors by and through the mail and/or wires, affecting interstate commerce.

**D.    The Broker-Dealer Defendants Sold DBSI Securities By Means of Materially Untrue Statements and Omissions of Fact.**

87.    The Broker-Dealer Defendants violated federal securities laws when, in soliciting investments, each of the Broker-Dealer Defendants made untrue statements of material fact and omitted to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading.  These false and omitted statements were contained in the Subscription Agreements and/or Letter of Intent and/or Purchaser Questionnaire each investor was required to execute.

88.    Implicit with being a licensed securities broker is an acknowledgment of the broker's obligation to comply with all state and federal securities laws and FINRA rules. Moreover, in every instance where a Subscription Agreement was executed in connection with the sale of a DBSI security, the relevant Broker-Dealer Defendant acknowledged its obligations to comply with all "state and federal securities laws and NASD Rule 2810."  In addition, with almost no exception, in the Subscription Agreement and/or Letter of Intent and/or Purchaser Questionnaire for each DBSI security, each Broker-Dealer Defendant certified that it had

"reasonable grounds to believe, on the basis of information supplied by the Purchaser, and other pertinent information," that the DBSI security was a "suitable investment for the Purchaser." Each Broker-Dealer Defendant thereby represented that it had undertaken a due diligence investigation sufficient to cause it to reasonably believe the investment was suitable for the Investor.

**E.    The Offering Documents Contained Countless Red Flags That Were Ignored by the Broker-Dealer Defendants.**

89.    A review of the DBSI securities offering materials reveals a number of significant red flags associated with each and every DBSI securities offering.  As set forth below, the Broker-Dealer Defendants either understood that the DBSI Companies were a financial train-wreck and recommended DBSI securities offerings anyway or they acted with reckless disregard for the truth when they failed to conduct the mandatory due diligence necessary to understand the DBSI Companies' full financial picture.

**(1)    Unaudited Financial Statements**

**a.    Failure to Follow GAAP Principles**

90.    As stated in a disclaimer in the DBSI financial statements included in most of the PPMs, DBSI followed GAAP only when it suited it.  No explanation was ever provided that indicated which principles were followed and which were not.

91.    DBSI's failure to follow GAAP was stated in a footnote to the financial statements included in most of the PPMs:

> In preparing the financial statement the Company normally follows accounting principles generally accepted in the United States of America ("GAAP"), however, not all of the principles used in preparing the financial statements are in conformity with GAAP.

92.    This disclaimer was a red flag that should have alerted the Broker-Dealer Defendants to investigate further and ask DBSI for more detail regarding which GAAP

principles were used and which were not and why.  None of the Broker-Dealer Defendants, however, performed this basic due diligence and, as a result, they failed to detect that DBSI repeatedly provided financial statements that selectively conformed to GAAP and flagrantly departed from GAAP when it suited DBSI's interests.

> **b.    Failure to Present Financial Statements on a Consolidated Basis**

93.    GAAP requires that entities that have control over subsidiaries, particularly by virtue of owning or controlling a majority interest in subsidiaries, must present their financial statements on a consolidated basis because there is a presumption that consolidated financial statements present a more accurate and meaningful presentation than separate financial statements.

94.    DBSI's financial statements failed to recognize the non-intercompany revenue and expenses, income or loss, and assets and liabilities of DBSI's majority-owned or controlled subsidiaries.  As a result, DBSI's financial statements failed to comply with GAAP.

95.    Critically, DBSI's failure to present financial statements on a consolidated basis resulted in the improper exclusion of each of DBSI's wholly-owned Funding Entities with real third-party liabilities ranging from $128 million as of December 31, 2004 to $194 million as of December 31, 2007.

96.    Two of DBSI's technology company subsidiaries, DBSI Western Technologies and Stellar, were producing "negative cash flow," despite DBSI's loans of hundreds of millions of dollars.  These technology companies experienced a net loss of approximately $8 million in 2005.  As subsidiaries under the control of DBSI, the financial statements of these technology companies, including the multi-million dollar losses, should have been presented on a consolidated basis with DBSI's financial statements.

97.     DBSI's financial statement for 2004 did not consolidate any of the financial information related to the technology companies.  Instead, a footnote in the financial statement stated:

> DBSI Housing Inc. accounts for investments using a cost method of accounting.  Under the cost method, an investment is recorded at its original cost and the Company recognizes income as it receives distributions from the investments.

98.     Nor did DBSI's financial statement dated June 30, 2007 consolidate the financial information related to any of its majority- and wholly-owned or controlled subsidiaries.  Similar to the 2004 financial statement, the June 30, 2007 financial statement stated:

> The Company accounts for its investments in affiliated real estate entities using the cost method of accounting.  Under the cost method, an investment is recorded at its original cost and the Company recognizes income as it receives distributions from the investments.

99.     DBSI blatantly disregarded GAAP by failing to present the financial reporting of its majority- and wholly-owned or controlled subsidiaries on a consolidated basis on its financial statements.  Therefore, the financial statements of these companies failed to provide an accurate and fair financial picture of DBSI.

100.     The Broker-Dealer Defendants either knew or recklessly failed to know that the "cost method" of accounting for loans to affiliated companies was not permissible under GAAP. The Broker-Dealer Defendants knew or recklessly failed to know that the financial data for these majority-owned or -controlled companies should have been presented on a consolidated basis with DBSI's financial statements.

101.     By failing to investigate and conduct the required due diligence, the Broker-Dealer Defendants were not able to assess the impact that the significant losses of the technology

company subsidiaries had on DBSI.  In doing so, the Broker-Dealer Defendants failed in their

obligations to their Investor clients.

102.    Despite the numerous red flags indicating that DBSI was not properly accounting

for hundreds of millions of dollars of liabilities and significant losses, the Broker-Dealer

Defendants neither requested the financial statements of DBSI's various subsidiaries nor

questioned the improper accounting methods that DBSI employed.  Thus, it is clear that the

Broker-Dealer Defendants did not even attempt to understand the financial condition of DBSI --

the guarantor of all DBSI securities offerings that the Broker-Dealer Defendants marketed and

sold.

### c.    Off Balance Sheet Liabilities

103.    DBSI's failure to present financial statements on a consolidated basis permitted it

to keep several hundred million dollars in real third-party liabilities -- that were described in the

financial statement footnotes -- hidden in its balance sheet.  If the Broker-Dealer Defendants had

demanded that DBSI present its balance sheet on a consolidated basis, as required by GAAP, it

would have become clear that DBSI was insolvent at all times from late 2004 through the

Petition Date.  This practice also included DBSI's treatment of direct and indirect liabilities as

purportedly "contingent."

104.    In the PPM that accompanied the offering in the 2005 Secured Notes Corp., one

of the Funding Entities, DBSI's balance sheet for 2004 stated that the company's net worth was

$70.7 million and that it had liabilities in the form of accounts payable totaling only $1.3 million.

However, this figure failed to include the liabilities of a number of DBSI Funding Entities' debt

offerings with a combined principal balance due at that time in the amount of $128,747,578.  A

schedule identified as Exhibit C to the 2005 Secured Notes Corp. PPM listed those open but

unconsolidated liabilities.  The Broker-Dealer Defendants knew or recklessly disregarded the fact that DBSI's balance sheet for 2004 materially understated its liabilities by not including this $128.7 million of debt owed by seven DBSI wholly-owned Funding Entities.

105.    Had this amount been properly presented on a consolidated balance sheet, DBSI's net worth drops from $70.7 million to negative $58 million.  In fact, if the Broker-Dealer Defendants had demanded to see a copy of DBSI's 2004 tax return in order to test or corroborate DBSI's unaudited and unconsolidated financial statements, they would have readily seen that the 2004 tax return "Balance Sheet per Books" showed liabilities of $186,792,121, an amount 139 times greater than the $1,338,599 in liabilities set forth on the 2004 statement balance sheet.

106.    DBSI's significant understatement of its liabilities was sufficient grounds for the Broker-Dealer Defendants to conclude that these investments were not suitable for any investor.

### i.    DBSI's Future Debt Service Liabilities

107.    Another aspect of the Broker-Dealer Defendants' due diligence failures deals with DBSI's direct and indirect obligation to pay debt service on substantially all of the master lease portfolio.  DBSI's obligation to pay debt service on the master leased properties was evident from the form of master lease included in each TIC offering, which, as described above, included DBSI's guarantee of all amounts owed by the master lessee.

108.    GAAP requires that a liability be recorded when "an existing condition, situation, or set of circumstances involving uncertainty as to possible . . . loss . . . to an enterprise that will ultimately be resolved when one or more future events occur or fail to occur."  The accounting standard specifies that an estimated contingent liability must be accrued if information available prior to the issuance of financial statements indicates that it is probable that a liability had been incurred as of the date of the financial statements and the amount of loss can be reasonably estimated.  The standard defines probable as "the future event or events are likely to occur."

109.    DBSI was either the master lessee or guarantor of the mortgage debt service obligation on 227 of 243 encumbered properties in the master lease portfolio with outstanding principal mortgage balances ranging from $528 million as of December 31, 2004 to $1.1 billion as of December 31, 2008.  By acting as the master lessee or guaranteeing the debt service obligations of the master lessee, DBSI took on significant risks.

110.    The Debtors' insolvency, operating losses, and predictable future losses from the master lease portfolio made the contingent liabilities for the debt service guaranty obligations probable.  DBSI had the financial information available to assess the probability that a contingent liability had been incurred as early as December 31, 2004.

111.    DBSI's 2005 financial statements show current and long-term liabilities in the total amount of $61,032,512.  A footnote to DBSI's 2005 financial statements disclosed that it was "contingently" liable for "most of the outstanding recourse indebtedness of its affiliated entities, including, without limitation, various offerings secured by loans, totaling approximately $187,000,000."  Thus, DBSI's liabilities, on a consolidated basis, were understated in the 2005 financial statement by approximately $126,000,000.

112.    Similarly, DBSI's 2007 financial statements show current and long-term liabilities in the total amount of $111,477,502.  A footnote to DBSI's 2007 financial statements disclosed that it was "contingently liable for most of the outstanding recourse indebtedness of its affiliated entities, including, without limitation, various offerings secured by loans, totaling approximately $211,200,000 at June 30, 2007 . . . ."  Thus, DBSI's liabilities, on a consolidated basis, were understated in the 2007 financial statement by approximately $100,000,000.

113.    The Broker-Dealer Defendants should have questioned whether DBSI's liability for the repayment of the debt was actually "contingent" or whether it should have been

recognized as a liability, not in a footnote, but on a consolidated balance sheet. DBSI's significant understatement of its liabilities was sufficient grounds for the Broker-Dealer Defendants to conclude that these investments were not suitable for any investor.

114.    Because the risk that DBSI would be called upon to pay some portion of the master lease debt service was probable, the Broker-Dealer Defendants should have taken this into account and demanded that DBSI include in the financial statement an accrued loss contingency liability accordingly.

### ii.    DBSI's Future TIC Rent Liabilities

115.    As set forth above, the DBSI Companies entered into numerous master lease agreements associated with the sale of TIC interests. In addition to payment of debt service, the master leases also required DBSI's master lessee entity to pay investors a fixed rental payment each month. In short, TIC Investors were promised a fixed rent payment, regardless of property cash flows or market risk.

116.    Each of DBSI's financial statements from 2005 through 2007 included a line item on the income statement for "rent expense." The rent expense ranged from $50.7 million in 2005 to $81.9 million in 2007. Although the Broker-Dealer Defendants would not have had access to DBSI's internal accounting data, they were clearly on notice of the prior year's rent expense, they knew the master lease portfolio was growing, they knew that each master lease was for a minimum ten-year term -- generally a twenty-year term, and they should have been able to determine how many properties were in the master lease portfolio at any given time.

117.    In fact, DBSI disclosed the master lease obligations to Investors that existed as of December 31, 2004. According to footnotes to DBSI's 2004 financial statements:

> The [DBSI Group] is contingently liable for most of the
> outstanding recourse indebtedness of its affiliated entities,
> including, without limitation, primarily 20-year master lease

obligations on approximately 8 million square feet of commercial property in approximately 130 projects in over 20 states, various Note issues, with a current outstanding net principal balance of approximately $129,000,000 secured by loans made to various affiliates which in turn are secured by interests owned by the affiliated entities.

118.    The master lessee was also responsible for "all costs of operating, managing, leasing and maintaining" the property during the term of the master lease.  The master lease agreements required the master lessee to sublease the property to tenants, pay operating expenses, debt service costs, and TIC rent, and collect management fees associated with each master lease.  Managing and collecting on these properties did not generally meet the obligation to pay Investors' promised rent payments after considering the costs of managing, leasing and maintaining the properties, a fact that was visible to the Broker-Dealer Defendants from DBSI's financial statements.

119.    According to DBSI's published financial statements, the master lease portfolio struggled to meet its obligations during the 2004 to 2008 period.  According to disclosures given to Investors, DBSI would use excess funds from other properties that it leased or would otherwise cover all expenses related to the master lease property portfolio.

120.    With the information that was available to the Broker-Dealer Defendants, they easily could have estimated the scope of DBSI's future master lease rent obligations and included the risks attendant to that long-term liability as a loss-contingency in their analysis of DBSI securities.

121.    By failing to conduct proper due diligence, Broker-Dealer Defendants failed to identify a significant liability related to the sales of TIC properties and the associated master lease agreements.  Generally, the promised rents and other obligations extended for 20 years as represented by various master lease agreements entered into by the master lessee entities.

Furthermore, since the master lessee was obligated to make fixed rent payments over a 20 year term, but the subtenant leases at each property were generally shorter-term in nature -- and were re-priced more frequently (i.e., five years), the master lessee carried a significant maturity risk and exposed it to changes in the market.  The Broker-Dealer Defendants should have recognized the maturity risks inherent to the master lessee.

122.    If the Broker-Dealer Defendants had included some estimated amount for the present value of the future master lease TIC rent (excluding operating expenses and debt service), that amount for the period from December 31, 2004 through October 31, 2008 would have been in the range of tens to hundreds of millions of dollars.

123.    DBSI's significant understatement of its liabilities was sufficient grounds for the Broker-Dealer Defendants to conclude that these investments were not suitable for any investor.

### d.    Netting of Intercompany Payables and Receivables

124.    DBSI netted its intercompany receivables against intercompany payables, an accounting trick that permitted it to hide the scope of its impaired loans to the technology companies, which as of June 30, 2008, amounted to $235 million.

125.    One of the biggest problems with DBSI's financial statements was DBSI's use of one line item under "Current Assets" that was called "Net receivable from affiliates."  This was grossly misleading for at least two reasons.

126.    First, in reviewing the balance sheet, the reader would not know that DBSI owed nearly $200 million to the bond and note holders because it had been netted against intercompany amounts due DBSI from the technology companies, DBSI Redemption Reserve and other affiliates so that what was left on the 2007 balance sheet was a small "Net receivable

from affiliates" in the amount of $1,418,376.  In other words, the liabilities presented on DBSI's balance sheet had been effectively understated by nearly $200 million.

127.    Second, the netting of receivables and payables was misleading because the payables and receivables being netted were two very different things.  The payables consisted of hard debt owed to bond and note holders with a defined maturity date.  On the other hand, the receivables from the technology companies were likely impaired and largely uncollectible debts that neither Stellar nor the technology companies could pay off.  Additionally, the netting of receivables and payables failed to reveal that interest was not currently being paid on any of the intercompany loans.

### e.    Failure to Test Receivables for Impairment

128.    GAAP requires entities to assess whether financial assets are impaired and recognize the impairment on their financial statements.  GAAP recognizes the uncollectible amount through an allowance account.  DBSI, however, failed to test its intercompany receivables for impairment, which allowed it to keep its massive, but impaired intercompany receivables from certain technology company subsidiaries and other affiliated companies on its balance sheet at full value.  Had an impairment analysis been performed and had the loans to its affiliated companies been appropriately valued, DBSI would likely have had a negative net worth.

129.    A footnote to the financial statements said "[t]he Company considers all receivables from affiliates as fully collectible and no allowance for doubtful accounts was deemed necessary."  Indeed, there was no allowance for the likelihood that DBSI might never recover its "investment."

130.    The Broker-Dealer Defendants did not attempt to verify these representations as they should have done.  Because DBSI's financial statements were unaudited and not prepared in accordance with GAAP, the Broker-Dealer Defendants had no reasonable basis to believe that the collectability of the intercompany receivables was assured.  They should have examined the receivables for impairment, at which point they would have discovered that it was improbable that DBSI would have actually received any of the amounts owed to it.

131.    The fact that DBSI made no allowance for doubtful accounts for related-party receivables on which DBSI depended for financial viability was sufficient grounds for the Broker-Dealer Defendants to conclude that these investments were not suitable for any investor.

### f.    Suspect Asset Valuations

132.    DBSI failed to obtain independent valuations of the assets listed on its balance sheet, including buildings, tenant improvements inventory and land.  This practice allowed management to assign asset values without proper support.

133.    DBSI's valuation methodologies utilized higher per square foot sales comparables and lower capitalization rates than that which would likely have been assigned by a certified appraiser.  Using a lower capitalization rate had the effect of producing a higher valuation for the property because the capitalization rate is calculated by dividing the annual net operating income by the purchase price of the property.

134.    Such a technique was highly suspect, especially because the capitalization rate did not reflect the market activity at that time.  The Broker-Dealer Defendants had an obligation to investigate and verify the value of the properties underlying the DBSI securities offerings.  Had they done so, they would have discovered that the properties were overvalued.  This information

was sufficient grounds for the Broker-Dealer Defendants to conclude that these investments were not suitable for any investor.

### g.    Accountable Reserves

135.    One way in which the DBSI Companies and the Broker-Dealer Defendants attempted to make TIC offerings more attractive to Investors was to promote DBSI's "responsibility" to maintain and/or improve the properties.

136.    The DBSI Companies collected funds called "Accountable Reserves."  By using the Accountable Reserves concept and excluding any Accountable Reserves from the purchase price paid by Investors, the DBSI Companies were able to lower the purchase price paid by Investors in an attempt to make the DBSI Companies' mark-up appear smaller.

137.    Investors were falsely assured that the collection of such Accountable Reserves would ensure that the investment would be properly maintained over the course of the master lease with a reduced risk of being required to invest additional funds for improvement or maintenance of the asset.

138.    Moreover, Investors were falsely assured that Accountable Reserves would provide an incentive for the master lessee to improve the property.

139.    Beginning in 2005, Investors in the TIC offerings were routinely promised that no less than five percent of the funds from Investors at closing would be set aside to pay costs and expenses for the maintenance and upkeep of the assets over the term of the master lease.

140.    Pursuant to the TIC offering PPMs and other offering materials disseminated by the Broker-Dealer Defendants to the investing public, the specified, authorized uses of Accountable Reserves funds were limited to tenant improvements, leasing commissions, capital

improvements for improved real estate, management fees, taxes, insurance and other related fees for unimproved real estate.

141.    The DBSI Companies, however, never intended to use the Accountable Reserves for the limited purposes stated in the PPMs, a fact that Broker-Dealer Defendants would have known had they exercised proper due diligence.

142.    In addition, Investors were falsely assured that collected Accountable Reserves would not be commingled with funds from any other source.  The DBSI Companies never intended to segregate the Accountable Reserve funds, a fact that Broker-Dealer Defendants would have known had they exercised proper due diligence.

143.    In fact, contrary to the affirmative representations contained in the PPMs, the Accountable Reserves funds were not segregated for their intended purposes, but were commingled with funds from earlier and later offerings and used for the DBSI Companies' general corporate purposes to satisfy their cash needs at a particular moment, including servicing the debt of earlier Investors and making distributions to DBSI Insiders, facts that Broker-Dealer Defendants would have known had they exercised proper due diligence.

144.    The DBSI Companies collected a total of nearly $100 million in Accountable Reserves funds, but at most, only approximately $18 million was used to pay expenses authorized in the PPMs.  Accordingly, approximately $82 million of Accountable Reserves funds were spent for unauthorized purposes.  These funds were commingled with all other funds of the DBSI Companies and used by various DBSI Companies for non-TIC related purposes.  Broker-Dealer Defendants would have known these facts had they exercised proper due diligence.

145.    For example, a July 12, 2007 Confidential PPM concerning TIC interests in the DBSI Beacon Point LLC, an entity wholly owned and managed by DBSI, stated that:

Accountable reserves for tenant improvements and leasing commissions will be repaid to the Purchasers to the extent not used in the operation of the Property.

146.    Each of the PPMs for TIC offerings that were marketed and sold by the Broker-Dealer Defendants contained substantially similar language to that quoted from the Beacon Point PPM.

147.    The DBSI Companies never intended that the Accountable Reserves would be used only for tenant improvements and leasing commissions, a fact that Broker-Dealer Defendants would have known had they exercised proper due diligence.

148.    Likewise, the DBSI Companies never intended that any unused Accountable Reserves would be returned to Investors, a fact that Broker-Dealer Defendants would have known had they exercised proper due diligence.

149.    Despite stating that the reserves would be "[a]ccountable" and leading Investors to believe that the funds would be segregated, the DBSI Companies never intended to segregate such funds, a fact that Broker-Dealer Defendants would have known had they exercised proper due diligence.

150.    The Beacon Point PPM contained a representation that "the funds of the Company would not be commingled with the funds of any other person or entity except for operating revenues from the Property." That representation was false.

151.    Each of the PPMs for DBSI TIC offerings that were marketed and sold by the Broker-Dealer Defendants contained substantially similar language to that quoted from the Beacon Point PPM.

152.    Mark Griffin, Director of Tax and Vice President of Tax and Internal Auditing at DBSI confirmed the practice of commingling accountable reserves when, in his September 16, 2009 interview with the Examiner, he explained: "My understanding is that cash was collected

37

into -- basically funneled into one account.  And so [Accountable Reserve funds] were not separately held in an account, but they were available for use by the business."

153.    The Accountable Reserve funds were commingled with other DBSI funds and were swept up by DBSI and other DBSI Companies for general corporate and non-TIC related purposes, a fact that Broker-Dealer Defendants would have known had they exercised proper due diligence.  Indeed, Mark Griffin stated in his September 16, 2009 interview with the Examiner that: "[T]he cash received by DBSI, which would include accountable reserves, would have been available to use throughout the business."

154.    The Accountable Reserves were neither recognized as income to DBSI nor were they held in segregated, property-specific accounts for the benefit of the TIC Investors and their properties.  The Accountable Reserves balances were, however, listed on DBSI's balance sheet, as both short-term and long-term liabilities.  A footnote to the financial statement explained:

> Accountable reserves represent funds paid to [DBSI] by tenant in common buyers for future building improvements and leasing commissions related to the real estate properties they buy.  As [DBSI] incurs costs related to building improvements and leasing commissions for the specific properties, the reserves will be reduced.  Any reserves remaining at the time the properties are sold are payable to the respective owners.

155.    DBSI's failure to escrow the Accountable Reserves was glaringly obvious from its balance sheet, something any minimally competent due diligence officer should have noticed.

156.    For example, on DBSI's December 30, 2007 financial statement, cash reserves and escrows totaled $32,740,236.  Adding in all cash, including security and utility deposits results in total cash of $53,905,520.  Yet the Accountable Reserve balance at the time was $66,866,072, greater than all cash accounts held by DBSI.

157.    It was clear from a review of DBSI's balance sheet that DBSI was not segregating the Accountable Reserves for authorized uses by the TIC properties; rather, it was commingling

the Accountable Reserves (contrary to the PPMs) and was rapidly converting and consuming them. Because DBSI's financial statements indicated that Accountable Reserves were not included in DBSI's total cash, Broker-Dealer Defendants should have questioned where the Accountable Reserves went.

158.    The fact that DBSI was commingling Accountable Reserves with its general corporate funds despite the fact that it explicitly represented to the Investors that it would not, was a material red flag for the Broker-Dealer Defendants and should have prompted further investigation. Such a material misrepresentation by the DBSI Companies was sufficient grounds for the Broker-Dealer Defendants to conclude that these investments were not suitable for any investor.

159.    The Investors -- including those who have assigned their claims to Plaintiff -- necessarily relied on the Broker-Dealer Defendants' representations concerning the use of Accountable Reserves in making the decision to invest in one or more of the DBSI TIC offerings. Adequate due diligence by the Broker-Dealer Defendants would have revealed that the foregoing representations were materially false and misleading. The Investors would not have purchased DBSI securities had the Broker-Dealer Defendants not communicated to them that their funds would be secure and would be used to improve the properties in which they invested.

### h.    Improper Recognition of Master Lease Guaranty Fees

160.    FASB Interpretation 45 requires that income received for guaranty fees be amortized over the life of the guaranty period, in the case of TIC offerings, typically not less than ten years. In the case of the Note/Fund offerings, the guaranty period would have been between

five and seven years.  Instead, DBSI recognized the master lease guaranty fees in full when paid, thereby improperly inflating revenues.

161.    The footnotes to DBSI's financial statements stated that the master lease income included certain fees "received from an affiliated entity for the company [DBSI] agreeing to enter into master leases on properties sold by the affiliate to tenant in common buyers."  Because the master lease fees were, in substance, payments for DBSI's guaranty of each of the master leases, revenue from such fees should not have been recognized as current income under GAAP, rather, it should have been amortized over the initial ten-year term of the master lease, regardless of whether the payments under the guaranty were probable.

162.    Specifically, DBSI's 2005 financial statement included $17,000,000 in guaranty fees.  Had that amount been properly amortized, DBSI's stated net income of $25,644,405 would have been reduced to $10,344,405, a material 60% reduction in net income.  DBSI's 2006 financial statement included $19,270,000 in guaranty fees.  Had they been properly amortized, DBSI's stated net income of $2,669,476 would have shown a loss of $14,673,524.

163.    DBSI's recognition of the full amount of the master lease guaranty fees on its income statement in the year received was a clear violation of GAAP, which requires that income earned for guaranty obligations be amortized and recognized equally over the term of the guaranty obligation.

164.    The Broker-Dealer Defendants knew or recklessly disregarded the fact that DBSI's recognition of the full master lease fees as current income in the year received (i) was improper under GAAP; (ii) artificially inflated DBSI's reported income; and (iii) falsely helped mask the operating losses realized by DBSI's master lease portfolio.  The failure to disclose this information made the financial statements included in the PPMs materially false and misleading,

a fact that Broker-Dealer Defendants would have known had they exercised proper due diligence.

165.    Such material misrepresentations by DBSI were sufficient grounds for the Broker-Dealer Defendants to conclude that these investments were not suitable for any investor.

### (2)    Cash Flow Projections

166.    DBSI's pro forma cash flow projections included in the TIC offering PPMs calculated net operating income before accounting for tenant improvements, leasing commissions, capital expenditures, debt service and TIC Investor rent.  If the Broker-Dealer Defendants had taken the time to properly calculate the projected net operating income, they would have realized that some of the TIC properties did not have positive cash flow overall, and most had at least some years where negative cash flow was projected.

167.    Many of the TIC properties operated at cash flow deficits and thus required DBSI or the master lessee to cover operating losses, debt service and/or TIC rent.  A significant number of the TIC properties required cash infusions.  According to the listing of master lease properties in one of the PPMs, eight of the 44 properties at that time (approximately 18.2%) had occupancy rates below 80%, carried approximately $85.4 million of debt, and required annual master lease payments of approximately $6 million.

168.    The Broker-Dealer Defendants should have, but failed to, inquire into how DBSI would pay its debts in the face of anticipated negative cash flow.  That fact also would have led them to conclude that the returns on the TIC offerings were necessarily dependent upon the financial strength of DBSI as the guarantor.  This also made due diligence on DBSI in its capacity as corporate parent, master lessee, and/or guarantor critical.  The cash flow projections

also uniformly relied on the ability to draw on Accountable Reserves that the Broker-Dealer Defendants failed to insure were reserved, escrowed or otherwise held in segregated accounts.

169.    DBSI's material misrepresentation regarding the cash flow projections was sufficient grounds for the Broker-Dealer Defendants to conclude that these investments were not suitable for any investor.

### (3)    Conflicts of Interest

170.    The DBSI Companies were a maze of unresolved conflicts of interest, including, for many DBSI companies, a complete lack of independent outside directors.  In many cases, the DBSI Companies were on both sides of transactions, controlling both the borrower and the lender.  Worse yet, the PPMs stated that there were no written procedures for resolving or dealing with these known conflicts of interest.

171.    The various DBSI Companies engaged in many intercompany transactions; however, there was neither a process for resolving the obvious conflicts of interest nor independent assurances that the transactions were carried out at arm's-length and supported by the proper documentation.  The existence of these numerous and regular related-party transactions should have prompted the Broker-Dealer Defendants to demand, among other things, DBSI financial statements that had been presented on a consolidated basis and audited.

172.    GAAP requires that the disclosure of related-party transactions include: (i) the nature of the relationship between the parties; (ii) a description of the transaction; (iii) the dollar amount of the transaction; (iv) the amount due from or to related parties; and (v) the terms of the settlement.

173.    The Broker-Dealer Defendants knew or should have known about the existence of the conflicts of interest because they were identified in the PPMs provided by the DBSI Companies.  For example, the PPM for DBSI Village at Old Trace LLC stated that:

> DBSI Housing Inc. has not developed, and does not expect to
> develop, any formal process for resolving conflicts of interest.
> While the foregoing conflicts could materially and adversely affect
> the Purchasers, DBSI Housing Inc., in its sole judgment and
> discretion, will attempt to mitigate such potential adversity by the
> exercise of business judgment.  There is no assurance that such an
> attempt will prevent adverse consequences resulting from the
> numerous conflicts of interest.

174.    Due to the nature of this disclosure and the potential for significant adverse consequences to Investors because of it, the Broker-Dealer Defendants were obligated to investigate further to determine the extent of the conflicts and assess whether the conflicts would impact DBSI's financial performances, financial reporting and ultimately the Broker-Dealer Defendants' clients' investments.

175.    The Broker-Dealer Defendants' woefully inadequate due diligence failed to identify this problem at DBSI and its affiliates.  The failure to resolve the DBSI Companies' conflicts of interest was sufficient grounds for the Broker-Dealer Defendants to conclude that these investments were not suitable for any investor.

### (4)    Commingling of Funding Entity Proceeds

176.    As described above, the stated purpose of raising funds through the Funding Entities was to loan the proceeds to other DBSI Companies.  In some instances, the proceeds were to be used to purchase properties for TIC syndication.  In other cases, the funds were ostensibly intended to re-finance existing obligations.  In still other instances, no purpose beyond lending the funds to DBSI Companies was specified.

177.    With respect to 2005 Secured Notes Corp. and 2006 Secured Notes Corp., the stated purpose of issuing the notes was to loan funds to affiliated special purpose entities to purchase real estate for TIC syndication.

178.    The stated purposes of the 2008 Notes Corp. offering were to loan funds to affiliated special purpose entities to purchase real estate for TIC syndication and to finance or re-finance non-real estate entities.

179.    The stated purpose of the Bond Corps. was simply to raise money to loan to other DBSI Companies.

180.    The real purpose behind all of the Funding Entities, however, was to keep DBSI's fraudulent Ponzi scheme afloat at the expense of unwitting Investors.

181.    On August 9, 2005, through a Confidential PPM, 2005 Secured Notes Corp. made an offering of $20 million in 8.15% notes.

182.    The 2005 Secured Notes Corp. PPM contained the following representation:

> [P]roceeds from the sale of the Notes will provide monies to make loans to
> [DBSI], and certain other subsidiary entities controlled by [DBSI] . . . The
> proceeds of any Loans to entities will be used only to acquire, develop and
> finance real estate properties prior to their sale, resale, third-party financing or
> syndication.

183.    The DBSI Companies never intended to use the proceeds from the 2005 Secured Notes Corp. offering only for the acquisition, development, or financing of real estate properties, a fact that Broker-Dealer Defendants would have discovered had they conducted proper due diligence.

184.    Despite the representations in the 2005 Secured Notes Corp. PPM, the funds were used for the DBSI Companies' general corporate purposes to satisfy the cash needs at a

particular moment, including servicing the debt of earlier Investors and making distributions to DBSI Insiders.

185.    The 2005 Secured Notes Corp. PPM further provided that the proceeds from the sale of the notes would not be commingled with DBSI's financial and business accounts nor the accounts of any other DBSI affiliates.

186.    Had the Broker-Dealer Defendants conducted proper due diligence, they would have discovered that DBSI intended to use and did use the offering proceeds to prop up the failing DBSI Companies by commingling the offering proceeds with those of other DBSI Companies and using the cash available to support current operations and obligations of the DBSI enterprise, and to line the pockets of the DBSI Insiders.

187.    On October 4, 2006, through a Confidential PPM, 2006 Secured Notes Corp. made an offering of $50 million in 8.41% notes.

188.    The 2006 Secured Notes Corp. PPM contained the following representation:

> [P]roceeds from the sale of the Notes will provide monies to make
> loans to [DBSI], and certain other subsidiary entities controlled by
> [DBSI] . . . . The proceeds of any Loans to Entities will be used
> only to acquire, develop and/or finance real estate properties prior
> to their sale, resale, third-party financing or syndication.

189.    The DBSI Companies never intended that the proceeds from the 2006 Secured Notes Corp. offering would be used only to acquire, develop and/or finance real estate properties, a fact that Broker-Dealer Defendants would have discovered had they conducted proper due diligence.

190.    Also, at the time the 2006 Secured Notes Corp. PPM was issued, there was no reasonable likelihood that loans made by the 2006 Secured Notes Corp. to various DBSI Companies would ever be repaid.  The DBSI Companies as a whole had severe cash flow

problems and operating losses such that the entities, most of which were insolvent, would never generate sufficient revenue to satisfy DBSI's obligations to the 2006 Secured Notes Corp. or to the people who invested in these entities. Had Broker-Dealer Defendants conducted proper due diligence, they would have discovered these facts.

191.    Despite the representations in the 2006 Secured Notes Corp. PPM, the funds were used for the DBSI Companies' general corporate purposes to satisfy the cash needs at a particular moment, including servicing the debt of earlier Investors and making distributions to DBSI Insiders, a fact that Broker-Dealer Defendants would have discovered through the exercise of proper due diligence.

192.    The 2006 Secured Notes Corp. PPM further provided that the funds raised would be maintained in a separate account and would not be commingled with the funds of DBSI and its affiliates. Despite this representation, the proceeds were used to prop up the failing DBSI Companies by making cash available to support current operations and obligations, a fact that Broker-Dealer Defendants would have discovered through the exercise of proper due diligence.

193.    The Investors necessarily relied on the representations that the funds raised by the Funding Entities would be used solely for the purposes stated in the PPMs and would not be commingled with the funds of DBSI and its affiliates. The Investors would not have purchased DBSI securities had the Broker-Dealer Defendants not communicated to them that the funds would not be commingled with DBSI's and the DBSI Companies' funds.

194.    Had the Broker-Dealer Defendants examined DBSI's financial statements more closely, as they should have done, they would have discovered that the offering proceeds and the prospects of all of the DBSI Companies were so hopelessly entangled that the Investors would never receive a return on their investment. The DBSI Companies' material misrepresentations

about their use of the offering proceeds were sufficient grounds for the Broker-Dealer

Defendants to conclude that these investments were not suitable for any investor.

### (5)    Unachievable Promised Returns

195.    The PPMs uniformly promised unrealistic rates of return to Investors.  For almost

all of the Funding Entity offerings, the cost of raising the funds, when amortized over the life of

the investment, plus the promised rate of return resulted in a borrowing cost to the DBSI

Companies that exceeded the returns that could reasonably be expected in the real estate market.

The Broker-Dealer Defendants should have realized this fact and questioned where the promised

returns were going to come from.  Like the Cash Flow Projections discussed above, this also

made due diligence on DBSI in its capacity as guarantor critical.

### a.    Note and Fund Offerings

196.    For example, on the note and fund offerings, a review of (i) the language in the

PPMs for the 2005 Secured Notes Corp. and 2008 Notes Corp., and (ii) a comparison of the rate

of return promised under the terms of the notes to the rates of return that could reasonably be

expected from a real estate investment at that time makes clear that the promised rate of return

was unachievable.

197.    The Funding Entities were bound by the terms of the offerings to pay high rates of

interest return to Investors -- typically between 8 and 11%.

198.    The PPM issued by 2005 Secured Notes Corp. explained the nature of the

investment being offered.  It represented that the note proceeds would be used to make loans to

DBSI or its SPE (i.e., subsidiaries controlled by it) "only to acquire, develop and finance real

estate properties prior to their sale, resale, third-party financing or syndication."

199.    DBSI "unconditionally guaranteed" the notes, which were also to be secured by first mortgages on the real estate owned by the borrower SPE at a maximum 85% LTV, which is the percentage of the value of assets that the amount of loans to related entities could not exceed. The 2005 Secured Notes Corp. PPM described a note offering of $20,000,000, which could be increased to no more than $40,000,000 at the sole discretion of 2005 Secured Notes Corp. and were to produce income at an interest rate of 8.15% per year.

200.    The 2008 Notes Corp. PPM emphasized the importance of the DBSI-enterprise guarantee:

> **Q.    Why invest in the Notes?**
>
> A.    The Notes are unconditionally guaranteed by the Guarantor, which has an unaudited net worth as of June 30, 2007, of $105 million.

201.    Also, in a section entitled "Risk Regarding the Guarantor," the 2008 Notes Corp. PPM contained representations about the financial strength of DBSI:

> The Guarantor and its affiliates control and/or have interests in numerous commercial real estate projects aggregating approximately 18,600,000 square feet and various other substantial non-real estate business interests with offices in many states and overseas.  In 29 years, the Guarantor and its affiliates have grown to more than 400 employees and have raised more than $1.5 billion in capital.  The Guarantor currently manages assets valued at over $2.65 billion.

202.    To further emphasize the importance of the DBSI guarantee, the 2008 Notes Corp. PPM expressly touted the "prior debt performance" of the "DBSI Group."  According to the PPM, as of December 31, 2007, DBSI had

> [r]etired eight of the 15 prior debt offerings and plans to retire three additional debt offerings, to total 11 offerings, by the end of 2008 representing nearly $127 million of retired debt.  . . . If retired as planned, in 2008, about 75% of all 2005 debt of this type will have been retired by the DBSI Group.

203.    Notably, the statement that the DBSI Companies had retired most of its prior debt was false.  The DBSI Companies had defaulted on past due principal and interest obligations to Investors holding notes, bonds, debt and sharing unit interests.  This is a fact Broker-Dealer Defendants would have known had they exercised proper due diligence.

204.    The 2005 Secured Notes Corp. PPM contained a section dedicated to describing the parameters of loans made to DBSI and to SPEs.  2005 Secured Notes Corp. was undercapitalized to conduct its business and service the notes, and therefore had to rely upon external sources of income to meet its obligations on the notes.  Concerning the repayment of loans made by 2005 Secured Notes Corp. to such entities -- which loans were made with noteholder monies -- the PPM identified five potential sources of funds that the Broker-Dealer Defendants could evaluate when determining whether the notes presented an acceptable investment:  (1) operating income-generated by the borrowing SPE; (2) loans from DBSI or a DBSI-affiliate; (3) sale or syndication of ownership interests in the SPE; (4) foreclosure of any mortgage given on property held by the SPE; and (5) DBSI's performance of its guaranty.

205.    The Broker-Dealer Defendants should have determined whether an Investor could rely, in any material sense, on the likelihood or ability of the borrowing SPE to service the notes at the indicated interest rate and thus provide a return on investment to note Investors.

206.    In at least two separate points in the PPM, the Broker-Dealer Defendants were told that the borrowing SPE had no obligation whatsoever to generate operating income to service its debt.  The PPM announced that the borrowing SPEs "are not required to have any operating cash flow as a condition of receiving a Loan."  Further illustrating the likelihood that the borrowing SPE could not and would not service its own debt, the PPM advised that "[t]here are no assurances that an [SPE] will generate any cash flow from operations."  In case there were

any doubt about the reasonableness of relying on income-generating operations of the borrowing

SPEs to service debt, the PPM explained that:

> [t]he risk of unavailability of cash flow is substantially increased
> because [2005 Secured Notes Corp.] anticipates that it will make
> Loans to a substantial number of [SPEs] that will be holding real
> estate for resale or development and that will not be generating any
> or significant cash flow from operations at the time the Loan is
> made.

207.    Other language in the PPM told the Broker-Dealer Defendants that any mortgage

granted to 2005 Secured Notes Corp. by the borrowing SPE on its real estate would likely not

serve as full recourse to note Investors in the event of a default.  In fact, the PPM explained that

the LTV requirement was suspect because it was based upon appraisals performed by an

interested -- rather than a disinterested -- entity and that therefore "may not reflect the actual fair

market value of a property."

208.    Perhaps more importantly, the PPM permitted 2005 Secured Notes Corp. to lend

money at a LTV ratio that was not based on any real estate appraisal:  "In the absence of an

appraisal, property value will be determined by DBSI utilizing industry acceptable valuation

methods."  The PPM also stated that "such valuation methodologies can be highly subjective and

result in valuations that may not be reflective of actual market value."

209.    As described in further detail below, Charles Hassard, a DBSI Insider with no

appraisal qualifications, frequently signed Officer's Certificates of Value certifying that the loan

did not exceed an 85% LTV ratio.  In other words, the PPM told the Broker-Dealer Defendants

that the LTV requirement provided no reasonable assurance that upon default, a sale of the

mortgaged property itself could produce proceeds sufficient to extinguish the debt owed to 2005

Secured Notes Corp.

210.    Finally, the PPM explained that:

> regardless of valuation method and the availability of appraisals,
> the 85% Loan to Value Ratio is very high and such leverage is well
> in excess of what would normally be permitted by third party
> lenders. In the event of [2005 Secured Notes Corp.'s] default on
> the Notes, accrued interest and Note charges, delinquent taxes . . .
> and other carrying and liquidation costs incurred by Note
> purchasers might well dissipate any remaining equity positions in
> the respective properties and lead to a loss of Note purchaser
> capital.

211. The PPM advised the Broker-Dealer Defendants that the 2005 Secured Notes Corp. would be lending money to entities that had no independent source of revenue and that any security given by such entities was suspect.

212. The remaining three sources of payment of principal and interest on investor funds are all tied to the DBSI enterprise. The first source was loans made to the borrowing entity from DBSI or its affiliates; in other words, DBSI or a DBSI-controlled entity would loan money to the borrowing entity, which in turn would pay 2005 Secured Notes Corp., which in turn would then pay interest and principal due to note Investors. The second source of payment to Investors was through funds raised through the DBSI enterprise's TIC syndication arms; in other words, the performance by 2005 Secured Notes Corp. of its obligations under the notes depended on the successful efforts of DBSI and DBSI Companies in marketing and selling new investments to other new investors. The third source was payment directly from DBSI in accordance with its guaranty obligations.

213. The PPM specifically identifies the significance of these sources:

> The ability of an [SPE] to service its Loan from [2005 Secured
> Notes Corp.] may be dependent on the financial and operational
> stability of its parent or affiliates, which include [DBSI]. The
> ability of an [SPE] to operate its business may depend upon the
> willingness and ability of its parent or another affiliate to loan it
> additional funds.

214.    Because the entity borrowing investor funds was not required to have an independent stream of income, a reviewing Broker-Dealer Defendant could only expect a return on investment by relying on the ability of DBSI and other entities to provide the funds used as a source of that return.  Any Broker-Dealer Defendant reading these statements would have to conclude that the return on notes was dependent upon the creditworthiness of the DBSI enterprise as a whole.

215.    By virtue of the act of recommending and selling the 2005 Secured Notes Corp., the Broker-Dealer Defendants necessarily expressed their understanding and reliance on the creditworthiness of the DBSI enterprise as a whole.  The PPM explained that DBSI was not only guaranteeing the notes, but that DBSI and its affiliates were the only possible sources of funds to pay interest and principal on the notes.

216.    At the time of 2005 Secured Notes Corp.'s offering, the Average Direct Capitalization Rate (the "Average Cap Rate") for real estate investments according to the Korpacz Real Estate Investor Survey was 7.56%.  The Average Real Estate IRR (a measurement of the annualized effective compounded rate of return that can be expected on a particular investment) was 9.14%.  The Average Cap Rate and the Average Real Estate IRR were metrics to which any reasonably competent securities broker selling the DBSI Companies' note and fund offerings would have looked to assess the expected rate of return on real estate investments in late 2005 when 2005 Secured Notes Corp.' offering was made.  Those rates would then be compared to the financial terms of the note or fund offering.

217.    According to the 2005 Secured Notes Corp. PPM, the notes were to bear an interest rate of 8.15%, which itself is greater than the 7.56% Average Cap Rate for real estate investments at the time.

218.    The primary metric used to measure the financial obligation of an offering to a note/fund entity is called "Total Cost of Financing." That metric represents the cost to the particular note/fund entity of offering the investment and performing the obligations incurred through the PPM and the particular debt instrument sold.

219.    The Total Cost of Financing the 2005 Secured Notes Corp. was 9.5% to 9.8% (assuming no redemptions and maximum redemptions), which is significantly greater than both the 7.56% Average Cap Rate and the 9.14% Average Real Estate IRR.

220.    The 9.5% to 9.8% Total Cost of Financing is higher than the interest rate of 8.15% because it includes the costs of marketing and selling the investment amortized over the maturity period of the 2005 Note instrument. The Total Cost of Financing represents the yield required by 2005 Secured Notes Corp. from its investments to pay interest on the note balance at the promised 8.15% and return original capital, after considering other front-end costs of the transaction, including those costs incurred by the DBSI Companies. Similar to a home loan bearing points, the all-in cost of money to 2005 Secured Notes Corp. ranged from 9.5% to 9.8%.

221.    At the time those notes were issued, a securities broker familiar with real estate investments could not have reasonably expected the 2005 Secured Notes Corp. to achieve a yield of 9.5% to 9.8% from direct investments in real estate. In fact, an experienced securities broker could not have reasonably expected returns in excess of 7.56% from real estate investments based upon Average Cap Rates (and this is even assuming that investment was made on a timely basis and in income-producing properties).

222.    Without DBSI's guaranty and the expectation of monies flowing from the DBSI enterprise to 2005 Secured Notes Corp. (as well as the DBSI Companies' other note/fund offerings), a securities broker experienced in real estate investment returns would have

considered an investment in 2005 Secured Notes Corp. to be unacceptable.  Investor funds could

be used to purchase real estate that did not generate any operating income that could be used to

service the notes.  Because the PPM did not obligate 2005 Secured Notes Corp. to obtain

objective appraisals of real estate assets purchased with Investor funds, mortgage liens on those

assets did not provide any reliable degree of security.  The interest rate on the notes, and the cost

to 2005 Secured Notes Corp. of the offering, both exceeded the rate of return that could be

expected in real estate investment at that time.

223.    Having reviewed the PPMs, the Broker-Dealer Defendants should have

recognized that DBSI itself was the only potential source of funds that could be used to pay the

obligations owed to Investors in the Funding Entities, and they should therefore have questioned

whether DBSI had the financial wherewithal to sustain the guaranteed, abnormally high rate of

return for Investors.

224.    As of the dates when the 2005 Secured Notes Corp. PPM, the 2006 Secured Notes

Corp. PPM, and the 2008 Notes Corp. PPM were issued, respectively, there was no reasonable

likelihood that loans made by the respective Notes Corps. to various DBSI Companies would

ever be repaid.  The DBSI Companies as a whole had severe cash flow problems and operating

losses such that the entities, most of which were insolvent, would never generate sufficient

revenue to satisfy the DBSI Companies' obligations to the Notes Corps. or to the people who

invested in the DBSI Companies.  The Funding Entity PPMs' material misrepresentations

regarding the DBSI Companies' ability to provide revenue streams at high rates of return were

sufficient grounds for the Broker-Dealer Defendants to conclude that these investments were not

suitable for any investor.

b.       **TIC Offerings**

225.    Two examples of TIC offerings with unachievable promised returns were DBSI North Park II and DBSI Park Plaza Retail Center.  Because DBSI was the guarantor for the payments to TIC Investors under the master lease agreements whether or not the underlying properties performed, DBSI's ability to perform was a crucial element of the analyses of the North Park, Park Plaza and other TIC investment offerings.

226.    DBSI North Park II promised investors a 6.5% cash-on-cash return, increasing at a rate of one percent annually.  This property was also saddled with a $19,950,000 first mortgage that paid interest at 5.895% annually.  The mortgage required interest only payments for the initial five years and then interest and principal amortized over 30 years.

227.    Bryan S. Mick and his firm Mick & Associates, P.C., LLO (collectively "Mick") wrote numerous due diligence reports provided to the Broker-Dealer Defendants -- and not provided to Investors -- which projected net operating income before debt service more conservatively than DBSI.  Using Mick's projections and the debt service and master lease payment assumptions that both DBSI and Mick agreed upon, the 10-year forecast projected cumulative cash flow deficits of more than $1 million.

228.    Similarly, the Park Plaza forecasts prepared by DBSI also promised unachievable cash flows.  The DBSI projection incorrectly assumed that tenant expense reimbursements were greater than reimbursable expenses, a clear error.  Their forecasts further assumed that occupants would pay the reimbursable expenses on the vacant space, an assumption that was not supported in the PPM.  Adjusting for those errors or unsupportable assumptions, the projected cash flow deficits, after payment of debt service and TIC rent to Investors, exceeded $1.1 million after 10 years.

229.    Aside from the clearly flawed projections for North Park and Park Plaza, DBSI's record of material misstatements and omissions, its record of self-serving accounting and refusal to provide audited financial statements as well as the Broker-Dealer Defendants' woeful failure to independently investigate any element of the DBSI investments despite obvious red flags -- including those raised by Mick -- provided no defensible bases for their recommendations of North Park, Park Plaza or other TIC investments.

230.    The Investors necessarily relied on the aforementioned representations that they would obtain the rates of return promised in the PPMs in that they would not have purchased DBSI securities had the Broker-Dealer Defendants not communicated to them that the high rates of return were achievable.

231.    As stated above, the TIC Offering PPMs' material misrepresentations regarding the DBSI Companies' ability to provide revenue streams at high rates of return were also sufficient grounds for the Broker-Dealer Defendants to conclude that these investments were not suitable for any investor.

### (6)    High Loan-to-Value Ratios

232.    The Funding Entity offerings also had restrictions on how Investor proceeds were to be used.  These restrictions generally related to permissible uses of the money and, if the money was to be loaned, on what terms and with what security.

233.    All of the PPMs for note offerings contained specific representations that the amount of loans to related entities would not exceed a certain percentage of the value of assets held by the recipient affiliate, also known as an LTV.

234.    In order to support the need for internal borrowing, the Debtors evaded LTV restrictions by misrepresenting the value of assets used as collateral for intercompany loans.

235.    To address cash needs, the DBSI Companies used funds raised from Investors through note offerings to generate operating cash.  DBSI created records purporting to reflect that this money was "loaned" to related entities using assets as "collateral."

236.    The "collateral" was often leveraged up to the full 85% LTV ratio set forth in the PPM.  Yet the "value" of the property was frequently established by internal company personnel with no appropriate training.

237.    For example, Charles Hassard, DBSI Insider and CFO with no apparent training as an appraiser, frequently signed an "Officer's Certificate of Value" in support of DBSI's assigned asset values.  This practice made DBSI's stated values of certain assets suspect, including "Land investments" (valued at $83 million as of December 31, 2007).

238.    Real estate valuations were placed on properties that did not accurately reflect actual value, with the objective of causing ostensible compliance with LTV requirements of the respective Funding Entities, a fact Broker-Dealer Defendants would have discovered through the exercise of proper due diligence.

239.    The value of the collateral was fraudulently and intentionally set at whatever figure was necessary to support the need for internal borrowing, a fact Broker-Dealer Defendants would have discovered through the exercise of proper due diligence.

240.    DBSI also often reallocated collateral at year end based on these suspect internal valuations to give the appearance of compliance with this 85% LTV ratio.

241.    The 2005 Secured Notes Corp. PPM contained a representation that before any intercompany loan could be made pursuant to the offering, "the aggregate Loan to Value Ratio of the loans must not exceed 85% based on fair market values of the properties of each borrower securing Loans as collateral."

242.     This 85% LTV was not adhered to, because the collateral used to support the LTV was knowingly overvalued by DBSI, a fact Broker-Dealer Defendants would have known at the time of the 2005 Secured Notes Corp. offering had they exercised proper due diligence.

243.     The 2006 Secured Notes Corp. PPM also stated "[t]o receive a Loan in accordance with the Loan requirements, an Entity must meet certain Loan requirements including a maximum overall 85% Loan to Value Ratio."

244.     This 85% LTV was not adhered to because the collateral used to support the ratio was intentionally and fraudulently overvalued, a fact Broker-Dealer Defendants would have known at the time of the 2006 Secured Notes Corp. offering had they exercised proper due diligence.

245.     The 2008 Notes Corp. PPM also contained a representation that "[t]o receive a Loan in accordance with the Loan requirements, an Entity must meet certain Loan requirements including a maximum overall 85% Loan to Value Ratio."

246.     But, this 85% LTV was not adhered to because the collateral used to support the ratio was intentionally and fraudulently overvalued.  This is a fact Broker-Dealer Defendants would have known at the time of the 2008 Notes Corp. offering had they exercised proper due diligence.

247.     The fact that an Insider with no experience as an appraiser set asset values should have caused the Broker-Dealer Defendants to investigate the accuracy of those valuations.  The DBSI Companies' material misrepresentations regarding their use of LTV ratios were sufficient grounds for the Broker-Dealer Defendants to conclude that these investments were not suitable for any investor.

### (7)   Misleading Subsidiary Audits

248.   Instead of providing audited financial statements for DBSI, DBSI used targeted audits of certain subsidiary entities that relied on the creditworthiness of DBSI.  The Broker-Dealer Defendants should have insisted that DBSI, the corporate parent and overall guarantor, provide audited financial statements.

249.   After some securities brokers expressed concern about the due diligence process, DBSI decided upon a new structure in which the master lessee would be Master Leaseco, which was initially capitalized with $10 million (another $5.4 million was subsequently added) in cash and was auditable.  However, this new structure was a subterfuge to create an audited entity that the Broker-Dealer Defendants should have clearly understood was illiquid and without sufficient resources to perform on all of the master leases on which it was obligated.  Moreover, the primary guarantor remained DBSI and its financial statements continued to be unaudited and not prepared in accordance with GAAP.

250.   The Broker-Dealer Defendants knew or had the obligation to know that the creation of Master Leaseco was simply window dressing with an audit report.

251.   Clearly, the fact that DBSI was not audited while certain of its affiliates were should have compelled the Broker-Dealer Defendants to raise additional questions about the motivations of a DBSI management team that created false transparency through subsidiaries while they indisputably endeavored to conceal or prevent third-party verification of fundamental facts about DBSI's debt burden, contingent liabilities, profits and losses, and net worth.

### (8)    Overstatements of DBSI's Equity And Net Worth

252.    Both the TIC offerings and the Note offerings grossly exaggerated DBSI's net worth.

253.    For example, a March 22, 2006 Confidential PPM related to DBSI Northpointe Tower LLC, an entity wholly owned and managed by DBSI, stated that "as of the date of this Memorandum, DBSI [] represents, and at the closing of subscriptions for the Interests, DBSI Housing Inc. will represent, that it has an unaudited net worth in excess of $70,000,000."

254.    Also, an August 9, 2007 Confidential PPM related to DBSI Haverford Place LLC, an entity wholly owned and managed by DBSI, stated that "as of December 31, 2006, DBSI [] represents, and at the closing of subscriptions for the interests will represent, that it has an unaudited net worth in excess of $84,000,000."

255.    Also, an October 31, 2007 Confidential PPM related to DBSI Cavanaugh II LLC, an entity wholly owned and managed by DBSI, stated that as of June 30, 2007, "DBSI [] represents, and at the closing of subscriptions for the Interests, will represent that it has an unaudited net worth of $105,000,000," *i.e.*, a claimed increase of $21 million in net worth in just six months.

256.    These representations are all gross exaggerations, a fact that Broker-Dealer Defendants would have known had they exercised proper due diligence.

257.    The Note offering PPMs also contained gross exaggerations about DBSI's net worth, a fact that Broker-Dealer Defendants would have known had they exercised proper due diligence.

258.    For example, the August 9, 2005 Confidential PPM for 2005 Secured Notes Corp. stated that at the closing of subscriptions for the Notes, DBSI [] would represent that it had "shareholder's equity of approximately $69,000,000."

259.    A year later, the claim of shareholder equity in DBSI had increased by the amount of the 2005 offering.  The October 4, 2006 Confidential PPM for DBSI 2006 Secured Notes Corp. stated that at the closing of subscriptions for the Notes, DBSI will represent that is has "shareholder's equity of approximately $89,000,000."

260.    The company's net worth, according to Note offering PPMs, had again increased significantly over the ensuing two years.  The February 6, 2008 Confidential PPM for DBSI 2008 Notes Corp. stated that the parent company "as of June 30, 2007, had an unaudited net worth of more than $105 million."

261.    The Investors -- including those who have assigned their claims to Plaintiff -- relied on the aforementioned representations in that they would not have purchased DBSI securities had the Broker-Dealer Defendants not communicated to them that DBSI had a track record of consistent and strong financial growth.

262.    Moreover, Investors relied on the aforementioned representations in that they would not have purchased DBSI securities had the Broker-Dealer Defendants not communicated to them that the level of DBSI's net worth was sufficient to meet all of its obligations, particularly the vast guarantee obligations DBSI had taken on.

263.    DBSI's reports of massive increases in net worth over short periods of time should have alerted the Broker-Dealer Defendants to the fact that neither DBSI nor the securities it issued were as sound as they were represented to be.

264.    Moreover, had the Broker-Dealer Defendants examined the red flags described above, they would have discovered that the PPMs' statements concerning DBSI's net worth were a sham, and that in reality DBSI was worth far less, having been dragged down by DBSI's crushing guarantee obligations.

265.    DBSI's material misrepresentations regarding its net worth were sufficient grounds for the Broker-Dealer Defendants to conclude that these investments were not suitable for any investor.

**F.    The Broker-Dealer Defendants Failed To Conduct Adequate Due Diligence.**

266.    The DBSI securities were improperly sold as exempt from the registration requirements under Rule 506 of Regulation D of the federal securities laws.

267.    Pursuant to the terms of the PPMs, Soliciting Dealer Agreements, and Subscription Agreements and/or Letters of Intent and/or Purchaser Questionnaires, and in accordance with their fiduciary duty to Investors, the Broker-Dealer Defendants were required to comply with federal and state laws and regulations of FINRA and conduct a due diligence investigation into each private placement they offered and sold to Investors.  The Broker-Dealer Defendants were required to investigate the issuer and the issuer's representations about the offerings so that they understood the nature of the investments and their risks, and to follow up on any adverse information that might reasonably be construed to be a "red flag."  The Broker-Dealer Defendants were also required to disclose to their customers any essential information that the Broker-Dealer Defendants did not have about the investments and any risks attendant to that lack of information.

268.    Implicit with being a licensed securities broker is an acknowledgment of the broker's obligation to comply with all state and federal securities laws and FINRA rules.

Moreover, in every instance where a Subscription Agreement was executed in connection with the sale of a DBSI security, the relevant Broker-Dealer Defendant acknowledged its obligations to comply with all "state and federal securities laws and NASD Rule 2810."  In addition, with almost no exception, in the Subscription Agreement and/or Letter of Intent and/or Purchaser Questionnaire for each DBSI security, each Broker-Dealer Defendant certified that it had "reasonable grounds to believe, on the basis of information supplied by the Purchaser, and other pertinent information," that the DBSI security was a "suitable investment for the Purchaser." Each Broker-Dealer Defendant thereby represented that it had undertaken a due diligence investigation sufficient to cause it to reasonably believe the investment was suitable for the Investor.

269.    These representations were false and misleading because each of the Broker-Dealer Defendants failed to conduct an appropriate due diligence investigation.

270.    Each of the Broker-Dealer Defendants knew or recklessly failed to know the foregoing representations were false and misleading because, as detailed below, they never planned to, and never did, conduct an appropriate due diligence investigation.

271.    The Investors relied on the foregoing representations in that they would not have purchased DBSI securities absent the Broker-Dealer Defendants' assurances that they had investigated the securities and DBSI as the sponsor of those securities.

272.    As described above, the Broker-Dealer Defendants were required, by virtue of their professional and fiduciary obligations, to comply with federal and state laws and FINRA regulations.  Accordingly, they were required to conduct an appropriate independent due diligence investigation into the DBSI offerings.

273.    The Broker-Dealer Defendants did not spend the due diligence fees they collected to conduct an independent due diligence investigation into the DBSI offerings.

274.    The Broker-Dealer Defendants knew or recklessly failed to know that the red flags identified above made investment in the TIC offerings and Funding Entities unsuitable for any investor.

275.    Rather than perform their own independent due diligence as was their professional and fiduciary obligation and for which they received substantial commissions and due diligence fees, the Broker-Dealer Defendants relied upon "due diligence reports" prepared by Mick, a company specifically chosen by DBSI.

276.    Mick wrote numerous due diligence reports provided to broker dealers on various DBSI related projects.  The Examiner obtained hard copy and electronic records from Mick both on a voluntary basis and pursuant to subpoena.

277.    Mick provided a list to the Examiner of approximately 140 different DBSI related offerings for which the firm provided due diligence reports to broker dealers.  According to Mick, the typical base fee charged to DBSI to conduct due diligence on any TIC offering, including the master-leased and land/option transactions from DBSI, was a fixed $8,500.  Additional amounts were charged depending on the number of broker-dealers that were provided with the report.

278.    Although the reports were ostensibly prepared for use by securities brokers, all fees were paid by the DBSI Companies and this arrangement resulted in Mick receiving from the DBSI Companies approximately $1.4 million since 2005.

279.    A significant portion of the due diligence reports prepared by Mick consisted of factual information, such as descriptive and background information, concerning various aspects

of the project or DBSI's business operations in general. The reports also identified the types of information Mick reviewed in preparing the reports. Mick's review of key project documents in the reports highlight selected elements considered to be significant.

280.    In addition to factual statements, the Mick reports purported to include assessments and opinions about various aspects of the offerings, and purported to include the identification of perceived benefits as well as concerns and risks.

281.    In many instances, Mick's reports acknowledged that a call on DBSI's guaranty of returns promised to Investors was inevitable. The reports also acknowledged that DBSI repeatedly refused to provide verifiable financial information.

282.    Despite identifying these and other red flags associated with the DBSI offerings, Mick did not resolve any of the issues raised.

283.    Moreover, despite the fact that Mick alerted them to various unresolved red flags, and despite their duty to conduct an additional investigation into those red flags, the Broker-Dealer Defendants made no effort to do so. Rather, the issues went unresolved and the Broker-Dealer Defendants facilitated the sale of DBSI securities to innocent Investors.

284.    It was a gross dereliction of the Broker-Dealer Defendants' professional and fiduciary duties to all Investors to rely upon the Mick reports rather than conduct their own independent due diligence.

285.    The Investors necessarily relied on the representations that the Broker-Dealer Defendants had conducted proper due diligence in that they would not have purchased DBSI securities had the Broker-Dealer Defendants not communicated to them that they had in fact conducted due diligence.

**FIRST CAUSE OF ACTION**

**Violations of § 10(b) and Rule 10(b)(5) of the Securities Exchange Act of 1934**

286.     Plaintiff repeats and realleges each and every allegation contained above as if set forth fully herein and further alleges as follows.

287.     The DBSI offerings at issue are securities within the meaning of the Securities Act of 1933 and the Securities Exchange Act of 1934.

288.     In connection with the offer and sale of the DBSI securities, the Broker-Dealer Defendants disseminated or approved false statements which they knew or reasonably should have known were false or misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

289.     Specifically, each Broker-Dealer Defendant certified that it had "reasonable grounds to believe, on the basis of information supplied by the Purchaser, and other pertinent information," that the DBSI security was a "suitable investment for the Purchaser."  Each Broker-Dealer Defendant thereby represented that it had undertaken a due diligence investigation sufficient to cause it to reasonably believe the investment was suitable for the Investor.

290.     The Broker-Dealer Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)     Employed devices, schemes and artifices to defraud;

(b)     Made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)     Engaged in acts, practices and a course of business that operated as a fraud and deceit upon Investors in connection with their purchase of DBSI securities.

291.    The Broker-Dealer Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal and misrepresent adverse material information about the business, operations and future prospects of the various DBSI Companies.

292.    Investors -- including those who have assigned their claims to Plaintiff -- relied on the Broker-Dealer Defendants' misrepresentations and/or omissions of material fact at all relevant times.  If it were not for Broker-Dealer Defendants' misrepresentations and omissions of material fact, Investors -- including those who have assigned their claims to Plaintiff -- would not have purchased the DBSI securities.

293.    The Broker-Dealer Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and disclose such facts, even though such facts were available to them.  The Broker-Dealer Defendants' material misrepresentations and/or omissions were done knowingly or recklessly for the purpose and effect of fraudulently inducing investment in the DBSI securities.

294.    At the time of said misrepresentations and omissions, Investors were unaware of their falsity and believed them to be true.  Had Investors known the truth which was not disclosed by the Broker-Dealer Defendants, they would not have purchased or otherwise acquired their DBSI securities.

295.    By virtue of the foregoing, the Broker-Dealer Defendants have violated § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

296.    As a direct and proximate result of the Broker-Dealer Defendants' fraudulent acts in connection with the DBSI security offerings, Investors -- including those who have assigned their claims to Plaintiff -- have suffered damages in connection with their respective purchases of DBSI securities in an amount to be determined at trial.

## SECOND CAUSE OF ACTION

**Securities Fraud, Arizona Securities Act, Ariz. Rev. Stat. §44-2001; California Corporate Securities Law, Cal. Corp. Code § 25501; Idaho Uniform Securities Act, Idaho Code § 30-14-509(b); Securities Act of Montana, Mont. Code Ann. § 30-10-307(1); North Carolina Securities Act, N.C. Gen. Stat. § 78A-56(a)(2); Oregon Securities Law, Oregon Rev. Stat. § 59.115(1)(b); Texas Securities Act, Tex. Rev. Civ. Stat. Ann. art. 581-33(A)(2); Utah Uniform Securities Act, Utah Code § 61-1-22(1)(a)(ii)**

297.    Plaintiff repeats each of the allegations of the above paragraphs as if fully set forth herein at length.

298.    Broker-Dealer Defendants made offers to sell and/or sold securities in numerous states, including Arizona, California, Idaho, Montana, North Carolina, Oregon, Texas, and Utah.

299.    Investors made offers to purchase and/or purchased and accepted these securities in numerous states, including Arizona, California, Idaho, Montana, North Carolina, Oregon, Texas, and Utah.

300.    By way of example, PAT beneficiary Alice Perkins, a resident of Arizona, purchased and/or accepted an interest in DBSI Boise Foothills LLC through Geneos Wealth Management, whose registered representative Andy Tomlinson was based in Arizona.

301.    By way of further example, PAT beneficiary Richard Sharp, a resident of California, purchased and/or accepted an interest in DBSI Landmark Towers LLC through Woodbury Financial Services, whose registered representative Laura Stees was based in California.

302.    By way of further example, PAT beneficiary Shirley Anderson, a resident of Idaho, purchased and/or accepted an interest in DBSI 2006 Land Opportunity Fund LLC through Waveland Capital.

303.    By way of further example, PAT beneficiary George Stearns, a resident of Montana, purchased and/or accepted an interest in DBSI Chinden Road through Geneos Wealth Management.

304.    By way of further example, PAT beneficiary Don Rumple, a resident of North Carolina, purchased and/or accepted an interest in DBSI Loop 1604 LLC through Geneos Wealth Management, whose registered representative Jeffrey Thompson was based in North Carolina.

305.    By way of further example, PAT beneficiary Harvey Wixman, a resident of Oregon, purchased and/or accepted an interest in DBSI West Boise LLC through Crown Capital Securities, whose registered representative Christopher Dorn was based in Oregon.

306.    By way of further example, PAT beneficiary Patrick L. Fulmer, a resident of Texas, purchased and/or accepted an interest in DBSI 2007 Land Improvement & Development Fund LLC through Geneos Wealth Management, whose registered representative Jesse Hauptrief was based in Texas.

307.    By way of further example, PAT beneficiary Edmund Lebaron, a resident of Utah, purchased and/or accepted an interest in DBSI Shoppes at Trammel LLC through Geneos Wealth Management, whose registered representative Tom Barkume was based in Utah.

308.    By way of further example, PAT beneficiary Stephen Horne, a resident of Nevada, purchased and/or accepted an interest in 2008 Notes Corp. through Wilson Davis, whose registered representative Les Anderton was based in Utah.

309.    As detailed above, Broker-Dealer Defendants made material misstatements and/or omissions in connection with the sale of these securities.  Specifically, each Broker-Dealer Defendant certified that it had "reasonable grounds to believe, on the basis of information supplied by the Purchaser, and other pertinent information," that the DBSI security was a "suitable investment for the Purchaser."  Each Broker-Dealer Defendant thereby represented that it had undertaken a due diligence investigation sufficient to cause it to reasonably believe the investment was suitable for the Investor.

310.    As detailed above, Broker-Dealer Defendants employed a device, artifice and scheme to defraud the Investors and engaged in acts, practices and a course of dealing which operated as a fraud or deceit upon the Investors in connection with the purchase and sale of these securities.

311.    The Investors were ignorant of each material misstatement's falsity, each omission, and the fraudulent and deceptive nature of Broker-Dealer Defendants' conduct.

312.    Pursuant to the above-cited state statutes, Broker-Dealer Defendants are therefore liable to Plaintiff, as Trustee of the PAT and assignee of the Investors.

## THIRD CAUSE OF ACTION

**Securities Fraud, Arizona Securities Act, Ariz. Rev. Stat. §44-2001; California Corporate Securities Law, Cal. Corp. Code § 25501; Idaho Uniform Securities Act, Idaho Code § 30-14-509(b); Securities Act of Montana, Mont. Code Ann. § 30-10-307(1); North Carolina Securities Act, N.C. Gen. Stat. § 78A-56(a)(2); Oregon Securities Law, Oregon Rev. Stat. § 59.115(1)(b); Texas Securities Act, Tex. Rev. Civ. Stat. Ann. art. 581-33(A)(2); Utah Uniform Securities Act, Utah Code § 61-1-22(1)(a)(ii)**

313.    Plaintiff repeats and realleges each and every allegation contained above as if set forth fully herein and further alleges as follows.

314.    The Broker-Dealer Defendants made offers to sell and/or sold securities in numerous states, including Arizona, California, Idaho, Montana, North Carolina, Oregon, Texas, and Utah.

315.    Investors made offers to purchase and/or purchased and accepted these securities in numerous states, including Arizona, California, Idaho, Montana, North Carolina, Oregon, Texas, and Utah.

316.    Plaintiff incorporates the examples of PAT beneficiary investments as set forth in Count 2.

317.    The material misrepresentations identified above occurred in connection with the sale of securities, as identified in further detail above, and were made by the Broker-Dealer Defendants.

318.    In addition, the conduct set forth in detail above was a device, artifice and scheme to defraud the Investors, as well as acts, practices and a course of dealing which operated as a fraud or deceit upon the Investors in connection with the purchase and sale of the above identified securities.

319.    The conduct of the Broker-Dealer Defendants set forth above evidenced an intent to deceive, manipulate and defraud.

320.    The conduct of the Broker-Dealer Defendants set forth above was deliberately reckless and was an extreme departure from the standards or ordinary care that presented a danger of misleading the Investors that was either known to the Broker-Dealer Defendants or so obvious that it must have been known.

321.    Each of the Investors was ignorant of each material misstatements' falsity and justifiably relied upon the material misstatements to their detriment and the Investors suffered economic loss as a proximate result of the material misstatements and their reliance thereon.

322.    Each of the Control Person Defendants directly or indirectly controlled the Broker-Dealer Defendants and/or served as a managing partner, executive officer, or director of the Broker-Dealer Defendants.  Each of the Control Person Defendants had the power to direct the management and policies of the Broker-Dealer Defendants by virtue of his, her, or its ownership interest in the Broker-Dealer Defendants and/or his or her role as a managing partner, executive officer, or director of the Broker-Dealer Defendants, as described on Exhibit A.  Those Control Person Defendants who did not directly or indirectly control the Broker-Dealer Defendants nonetheless served as managing partners, executive officers, or directors of the Broker-Dealer Defendants, as described on Exhibit A.

323.    Pursuant to the above-cited state statutes, the Control Person Defendants are therefore jointly and severally liable to Plaintiff, as Trustee of the PAT and assignee of the Investors, with and to the same extent as the Broker-Dealer Defendants.

**FOURTH CAUSE OF ACTION**

**Common Law Fraud**

324.    Plaintiff repeats and realleges each and every allegation contained above as if set forth fully herein and further alleges as follows.

325.    All of the misrepresentations and omissions detailed above were made with the intent to mislead Investors and with the specific intent to have Investors rely on said misrepresentations and omissions.  At a minimum, the representations were made recklessly, without knowledge of their truth or falsity.  Investors -- including those who have assigned their

claims to Plaintiff -- did rely thereon and made investments in the DBSI securities to their

detriment resulting in substantial losses.

326.    Further, the Broker-Dealer Defendants' misrepresentations and omissions

constitute constructive fraud, which entails the use of a confidential or fiduciary relationship to

take advantage of another.

327.    The fraud, misrepresentation, and the omission claims are quasi-contractual in

nature and arose from and are implied from the contractual relationship between Investors who

assigned their claims to Plaintiff and Broker-Dealer Defendants.  These claims also arose

independently from the contractual relationships.

328.    As a consequence of the Broker-Dealer Defendants' fraudulent conduct, Investors

have been injured for which they are entitled to recover damages from the Broker-Dealer

Defendants in an amount to be determined at trial.

## FIFTH CAUSE OF ACTION

### Negligence

329.    Plaintiff repeats and realleges each and every allegation contained above as if set

forth fully herein and further alleges as follows.

330.    At all relevant times, the Broker-Dealer Defendants had professional and

fiduciary obligations to review and approve the content and representations made in the PPMs

distributed to all Investors, and to recommend suitable securities to Investors.  The Broker-

Dealer Defendant owed Investors -- including those who have assigned their claims to Plaintiff --

duties to use such skill, prudence and diligence as other members of their profession commonly

possess and exercise in connection with the marketing and sale of securities such as the DBSI

securities.

331.    The Broker-Dealer Defendants, by virtue of their position as broker dealers, their professional skill and ability, the level of confidence and care imposed upon other broker dealers in similar positions, and their professional and fiduciary obligations, owed Investors a duty of due care.  The industry standard of care is set forth by FINRA, the SEC rules and State Acts and Administrative Codes.

332.    For example, NASD Rule 2310(a) -- which is now encapsulated in FINRA Rule 2111 -- requires that "[i]n recommending to a customer the purchase, sale or exchange of any security, a member shall have reasonable grounds for believing that the recommendation is suitable for such customer upon the basis of the facts, if any, disclosed by such customer as to his other security holdings and as to his financial situation and needs."

333.    The Broker-Dealer Defendants breached their duty by failing to exercise reasonable care and competence in conducting their due diligence in connection with the marketing and sale of the DBSI securities.

334.    The Broker-Dealer Defendants' violations of these standards, as detailed more fully above, constitute gross negligence and negligence *per se.*

335.    As a direct and proximate cause of the Broker-Dealer Defendants' negligence, certain Investors who assigned their third-party claims to Plaintiff have been injured and are entitled to recover damages from the Broker-Dealer Defendants in an amount to be determined at trial.

### SIXTH CAUSE OF ACTION

**Breach of Fiduciary Duty**

336.    Plaintiff repeats and realleges each and every allegation contained above as if set forth fully herein and further alleges as follows.

337.   At all times relevant hereto there existed between the Broker-Dealer Defendants and Investors a fiduciary relationship by reason that:

(a)   the Broker-Dealer Defendants at all times possessed superior knowledge, judgment, skill and experience in the securities markets in contrast to the Investors' lack of meaningful knowledge and understanding in that the Investors could not fully appreciate the substantial risk to which their monies were exposed; and

(b)   the Broker-Dealer Defendants at all times had access to the books, records, and other sources of information concerning the financial and operating condition of DBSI, the rules and policies of FINRA and the applicable federal and state statutes.

338.   This fiduciary duty arose from and is implied from the contractual relationship between the Broker-Dealer Defendants and the Investors who assigned their claims to Plaintiff. This fiduciary duty also arose independently from the contractual relationship between the Broker-Dealer Defendants and the Investors who assigned their claims to Plaintiff.

339.   Because of the Broker-Dealer Defendants' superior knowledge, skill, judgment, and experience in the securities markets, the Broker-Dealer Defendants owed Investors a duty to recommend suitable investments, to disclose all material facts, and to refrain from misleading them.  Further, the Broker-Dealer Defendants owed this fiduciary duty to protect and further the interests of Investors -- including those who have assigned their claims to Plaintiff -- over and above their desire to generate commissions and further their own financial interests.  The industry standard of care is set forth by FINRA, the SEC rules and State Acts and Administrative Codes.

340.   For example, NASD Rule 2310(a) -- which is now encapsulated in FINRA Rule 2111 -- requires that "[i]n recommending to a customer the purchase, sale or exchange of any security, a member shall have reasonable grounds for believing that the recommendation is

suitable for such customer upon the basis of the facts, if any, disclosed by such customer as to his other security holdings and as to his financial situation and needs."

341.    The Broker-Dealer Defendants specifically had a duty by virtue of their fiduciary relationship with Investors to conduct proper due diligence and to give honest and complete information by disclosing the true nature of these securities and the attendant risks of investing in them.  Moreover, the Broker-Dealer Defendants had a duty to disclose to Investors that because of the many red flags described above, the securities were not suitable for any investor.

342.    Because of the fiduciary relationship between Investors and the Broker-Dealer Defendants, Investors -- including those who assigned their claims to Plaintiff -- justifiably and reasonably relied to their detriment on the Broker-Dealer Defendants' superior knowledge, skill, judgment, and experience in handling their investments.

343.    The Broker-Dealer Defendants knowingly and deliberately breached their fiduciary duties by making material misrepresentations, failing to conduct a proper due diligence investigation, failing to make material disclosures, and recommending to Investors unsuitable securities in total disregard for the best interests of Investors, solely for the purpose of enriching themselves, and concealing the unsuitable nature of the transactions by not making the requisite disclosures to Investors.  Broker-Dealer Defendants' disregard and violation of the rules of the SEC and FINRA governing their conduct and the conduct of their agents and employees constitutes a breach of fiduciary duty to Investors.

344.    As a direct and proximate cause of the Broker-Dealer Defendants' breach of fiduciary duty, those Investors who have assigned their claims to Plaintiff have been injured and are entitled to recover damages from the Broker-Dealer Defendants in an amount to be determined at trial.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff requests that the Court enter relief and judgment in his favor and against Defendants as follows:

a)      Awarding compensatory damages, including rescissionary damages where applicable, in favor of the Plaintiff against Defendants, jointly and severally, for all damages sustained as a result of the Defendants' wrongdoing in an amount to be proven at trial, including interest thereon;

b)      Awarding Plaintiff reasonable costs and expenses incurred in this action, including counsel fees, expert fees, and prejudgment and post-judgment interest;

c)      Allowing PAT members who still hold their DBSI securities to tender these securities to the Defendants; and

d)      Such other relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(a), Plaintiff hereby demands a trial by jury on all issues so triable.

Dated:  March 18, 2015                **VARIN WARDWELL THOMAS &**
Boise, ID                             **KUNKEL, PLLC**

                                      By: /s/ J. Will Varin
                                      J. Will Varin, Of the Firm (Idaho Bar No. 6981)
                                      P.O. Box 1676
                                      Boise, ID 83701
                                      Telephone: (208) 922-7060
                                      Facsimile: (866) 717-1758
                                      Email:  willvarin@varinwardwell.com

                                      **GIBBONS P.C.**

                                      By:  /s/ Debra A. Clifford
                                      Debra A. Clifford, Esq. (Idaho Bar No. 9029)
                                      One Gateway Center
                                      Newark, NJ 07102
                                      Telephone:  (973) 596-4843
                                      Facsimile:  (973) 639-6498
                                      Email: dclifford@gibbonslaw.com

                                      *Counsel to James R. Zazzali, as Trustee for the DBSI*
                                      *Private Actions Trust*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 18th day of March, 2015, I electronically filed the foregoing document with the U.S. District Court. Notice will automatically be electronically mailed to the following individuals who are registered with the U.S. District Court CM/ECF System:

| | |
|---|---|
| Armand J. Della Porta , Jr | ajdellaporta@mdwcg.com |
| Artemio C. Aranilla , II | acaranilla@mdwcg.com |
| Bradley S Richardson | brad@garrettrichardson.com, meghan@garrettrichardson.com, ragan@garrettrichardson.com |
| Brett G. Evans | brett@eklawpc.com |
| Carla B. Minckley | cminckley@birgeminckley.com |
| Charles J. Brown , III | cbrown@gsbblaw.com |
| Christopher Viceconte | cviceconte@gibbonslaw.com |
| Christopher A. Ward | CWard@polsinelli.com |
| Debra A Clifford | dclifford@gibbonslaw.com |
| Denis C. Dice | dcdice@mdwcg.com |
| Gavin F Quill | gavin.quill@faegrebd.com, paulette.ohnemus@faegrebd.com |
| Geoffrey Graham Grivner | geoffrey.grivner@bipc.com |
| James M. Lee | jlee@gibbonslaw.com |
| Jason R Halpin | jhalpin@gibbonslaw.com |
| Jay Norman Moffitt | jmoffitt@mnat.com |
| Jed W Manwaring | jmanwaring@evanskeane.com |
| Jeff J. Hicks | jjhicks@faegre.com |
| Joel M. Wertman | jmwertman@mdwcg.com |
| John B Holland | john.holland@faegrebd.com |
| Judy L Geier | jgeier@evanskeane.com |
| Julie Ann Finocchiaro | rbgroup@rlf.com |
| Keely E. Duke | ked@dukescanlan.com, klb@dukescanlan.com, sls@dukescanlan.com |
| Kevin Alan Griffiths | kag@dukescanlan.com, klb@dukescanlan.com |
| Kevin J. Connors | kjconnors@mdwcg.com |
| M Michael Sasser | mms@sasseringlis.com, ceh@sasseringlis.com, nc@sasseringlis.com |
| Regina M. Matozzo | rmatozzo@ferryjoseph.com |
| Richard L Stacey , Jr | stacey@mwsslawyers.com, lemieux@mwsslawyers.com |
| Robert J. Stearn , Jr | stearn@rlf.com |
| Stephen W. Spence | sws@pgslaw.com |
| Terri L. Combs | terri.combs@faegrebd.com, paulette.ohnemus@faegrebd.com |
| Theodore J. Tacconelli | ttacconelli@ferryjoseph.com |
| Thomas D. Birge | tbirge@birgeminckley.com |

/s/ J. Will Varin
_____
J. Will Varin